[No. 28944. Department One. April 2, 1943.]

J. W. Hoover, *Respondent*, v. Millers National Insurance Company, *Respondent*, The Fidelity & Guaranty Fire Corporation of Baltimore, *Appellant*, The Puget Sound National Bank of Tacoma, *as Trustee*, *Respondent*.[1]

[1]Reported in 135 P. (2d) 846.

408

*Groff & Kelleran* and *William A. Herren,* for appellant.

*Smith, Matthews & Wilkerson* and *Paul H. Heineke,* for respondent Millers National Insurance Company.

MALLERY, J.—This was an action prosecuted by Washington toll bridge authority, through its assignee, J. W. Hoover, substituted plaintiff, against Millers National Insurance Company and Fidelity & Guaranty Fire Corporation of Baltimore. The Puget Sound National Bank of Tacoma, as fiscal agent and trustee for Tacoma Narrows Revenue Toll Bridge Bonds of the Washington toll bridge authority, although allied in interest with the Washington toll bridge authority, was named in the original complaint as a defendant, and so remains. Hereinafter and for convenience, we shall refer to the plaintiff as the authority and to the defendants, respectively, as the Millers, the F & G or appellants, and the bank.

The object of the action was to recover an agreed amount of insurance, it being stipulated that one or the other of the insurance company defendants was liable therefor and that the other was not. The trial court held that the F & G was liable, and this is an appeal by the latter from that judgment.

The authority was created by the 1937 legislature, chapter 173, p. 654, Laws of 1937, Rem. Rev. Stat., Vol. 7A, §§ 6524-1 to 6524-21 [P. C. §§ 2697-501 to 2697-521], inclusive. The authority itself and the officials thereof were granted broad powers by the legislature, including authority to construct such toll bridges as they from time to time deemed necessary, and the officials thereof were expressly empowered to do such acts and make such agreements, not inconsistent with law, as might be necessary or desirable in connection with their duties, including, among other things, the insuring of such toll bridges as were constructed.

The Tacoma narrows bridge was completed on July 1, 1940. It collapsed on November 7, 1940, and became a total loss.

Prior to the time that any insurance was placed upon the bridge, the authority discussed the matter of insurance at a meeting which was held on July 14, 1939. All of the members of the authority, except the state auditor, were present at the meeting, and the minutes of the meeting show that the following motion was adopted by the unanimous vote of the members present:

"That L. V. Murrow, Director of Highways and Chief Engineer of the Washington Toll Bridge Authority, together with P. H. Winston, Secretary of Authority, be, and they are hereby authorized on behalf of the Washington Toll Bridge Authority *to provide for* the securing of rates, insurance representation, insurance contract *and the placing of insurance* necessary and convenient in all-risk, use and occupancy, public liability and property damage, and any other classes for the Lake Washington Bridge and the Tacoma Narrows Bridge." (Italics ours.)

The authority given by the resolution was never canceled, altered, or modified, though the authority was advised and discussed what was being done under it.

On June 26, 1940, the authority wrote a letter appointing LaBow, Haynes Co., Inc., as brokers for the authority in connection with the insurance upon the Tacoma narrows bridge. This letter is as follows:

"LaBow, Haynes Company, Inc. June 26, 1940.
Dexter Horton Building
Seattle, Washington
 PWA WASH. 1870-F
 Tacoma Narrows Bridge
 Insurance

"Gentlemen:

"This is to notify you that the Washington Toll Bridge Authority does hereby appoint you as *brokers* for the securing and placing of insurance required on the Tacoma narrows bridge. This appointment is effective upon the time of your receipt of this correspondence, or not later than 10:00 o'clock, a.m., Thursday, June 27, 1940.

"You are authorized to write insurance on the Tacoma narrows bridge in the full amount of $6,500,000, *in accordance with the provisions of the Trust Indenture,* a copy of which is enclosed herewith. This insurance, to be written by you, must be in a form and at a rate satisfactory to the Washington Toll Bridge Authority.

"This authorization is *exclusive* to you and revokes any other or previous authorization upon this subject issued by the Washington Toll Bridge Authority. This authorization is subject to revocation in the event that the requirements of the insurance or of the Washington Toll Bridge Authority are not, in the judgment of the authority, satisfactorily met.

 "Yours very truly,
 "WASHINGTON TOLL BRIDGE AUTHORITY,
 BY P. H. WINSTON
 Secretary of Authority.

"PHW:MH
cc: Andrew
 Eldridge
 Durkee
 Glenn" (Italics ours.)

Hereafter, LaBow, Haynes Co., Inc., will be referred to as LaBow.

Generally, the matter of handling the insurance was left to LaBow, although it was instructed by Winston, with the consent and advice of the authority, that the authority preferred, in the first instance, that the policies should be secured at the lowest possible rate. It was to place all insurance possible in nonconference companies, and as much insurance as possible was to be placed with the companies who had their home offices in the state of Washington. The insurance must be placed with companies who were authorized to write business in the state of Washington, and the insurance could not be placed in a greater amount than the companies or their agents were authorized to write. Outside of those general limitations, LaBow was left to handle the insurance as it chose. The selection of the companies in which to place the insurance was left to LaBow. LaBow, as broker, paid the premiums on the policies to the companies directly and then billed the authority.

The insurance was all originally secured by LaBow by securing binders from the various insurance companies. Prior to the issuance of policies, many companies which had issued binders canceled their binders through notice to LaBow only, and LaBow secured other binders in substitution therefor. These cancellations and substitutions were all handled by LaBow without any prior notice to the authority.

On July 31, 1940, policies of insurance had not yet been issued and LaBow secured extension of the binders which were then carried upon the bridge from August 1st to August 10th. On August 20, 1940, the binders had all been replaced by policies of insurance and the policies in the amount of five million two hundred thousand dollars all-risk, and two hundred forty

thousand dollars use and occupancy, were delivered to the authority by LaBow with a letter of inclosure bearing date of August 20, 1940.

Among these policies were two fifty thousand dollar policies of the Millers National Insurance Co., on one of which the Millers has paid the loss.

In September, 1940, the Dearborn National Insurance Co., which had an all-risk policy in the amount of one hundred fifty thousand dollars, orally notified LaBow of its intention to cancel its policy. No notice of this cancellation was given to the authority by either the company or LaBow. On receipt of this notice, LaBow procured an endorsement from the Merchants of New York, adding one hundred fifty thousand dollars coverage to its policy. After this endorsement was obtained, it was mailed to the authority, together with a letter from LaBow dated September 25, 1940, in which letter the authority was advised that the brokers had canceled the Dearborn National policy and replaced the coverage with the Merchants of New York.

*No objection of any kind was voiced by the authority to the actions of LaBow in procuring other insurance upon receipt of oral notice of cancellation of these three policies without first consulting with the authority.*

Winston testified that, during October and November, 1940, LaBow took care of all matters pertaining to the all-risk and use and occupancy insurance upon both bridges, and that no other broker or insurance agent at any time ever acted for the authority in connection with the cancellation and replacing of insurance.

On approximately October 31, 1940, the Theo. Jensen Agency, which had written one of the two fifty thousand dollar policies that the defendant Millers had upon the narrows bridge, upon instructions from the Millers, called the office of LaBow and talked with Miss Nelson of that office, who had largely handled the

placing of the line for LaBow, and advised her that the Millers wished to cancel the policy written through its office. Miss Nelson advised Mr. Jensen that she was satisfied that there was a present market for the insurance, that the policy of the Millers could be replaced, and that she would take immediate steps to procure fifty thousand dollars of coverage from other sources to replace this policy of the Millers.

This oral request for cancellation of the Millers' policy was followed up by formal written notice of cancellation, dated November 4, 1940, which was received by the authority on November 6, 1940. Mr. Winston, who testified in response to the question:

"Q. State whether or not the acceptance of cancellation and the replacing of coverage was one of the things which you had directed and expected LaBow, Haynes Co., Inc., as brokers for the Washington Toll Bridge Authority to attend to? A. I believe that no place in writing did we direct LaBow Haynes to attend to those matters. Mr. Murrow and I had expected that they would attend to such matters and in the discussions had between Mr. LaBow and myself, either by telephone or personally, where those matters were involved, he was directed to proceed with the cancellation and replacing of new insurance."

He also testified that, a short time before the bridge collapsed, he was in the office of LaBow in Seattle and was advised that the Millers desired to cancel one of its policies; that he at that time mentioned the fact that the policies all had a sixty-day cancellation clause and that the Millers could be held to sixty days, but, after being told by Mr. LaBow that it was advisable in such cases to replace the insurance promptly where there was a market for it, and that there was a market in this instance, he told LaBow to go ahead and replace it. His words were:

"Yes, when he finally convinced me that there was no sense in enforcing the sixty days' clause, I told him

when he could get the other insurance, to replace it, all right, to go ahead and let them cancel it."

Pursuant to that direction, on November 6, 1940, LaBow called the office of McCollister & Campbell, Inc., who were.then and now are the general agents of the F & G, and advised said agents that they had fifty thousand dollars of insurance open on the Tacoma narrows bridge and fifty thousand dollars of insurance open on the Lake Washington bridge, and asked them if they would like to have it. The agent of the F & G said: "We certainly did want it," and agreed to write and did write letter binders effective as of November 6, 1940, insuring fifty thousand dollars on each bridge, which were delivered to LaBow early in the morning of November 7, 1940. The one on the narrows bridge is as follows:

"LaBow Haynes & Company November 6, 1940
Dexter Horton Building
Seattle, Washington
 ATTN: Miss Nelson
"Gentlemen:
 Re: Washington Toll Bridge Authority
 "Please be advised that we are binding as of November 6, 1940, $50,000.00 Property Damage Insurance on the Narrows Suspension Bridge for the benefit of the above named assured, as per the terms and conditions of the Bridge Property Damage IMUA Form, pending receipt of forms for the issuance of a policy.
 "FIDELITY & GUARANTY FIRE CORPN.
 By McCOLLISTER & CAMPBELL, INC.
 Per L. L. EDWARDS"

After the loss, LaBow acted as broker and manager at the meeting on the 8th of November representing the authority, and thereafter generally represented the authority in regard to all matters pertaining to the loss. For the first several weeks after the loss, Mr. LaBow spent practically all of his time with these duties.

The F & G binder was procured to replace the Millers' policy here in question and not with the intention of procuring additional insurance. On November 8, 1940, the authority, through Winston, its secretary, notified all of the companies of the loss under their policies. A notice was sent to the F & G under its binder of November 6, 1940. No notice was sent to the Millers of the loss under its policy written through the Theo. Jensen Agency upon which the request for cancellation had been received and granted, though notice was sent to the Chester J. Chastek Agency, which wrote the other fifty thousand dollar policy of the Millers, which has since been paid.

Shortly after the loss, the insurance companies interested in the loss formed the narrows bridge loss committee for the purpose of settling and adjusting the loss and protecting the rights of the various insurance companies interested. The F & G became a party to the agreement forming the narrows bridge loss committee. The Millers became a party to the agreement forming this committee as to its fifty thousand dollar policy written through the Chester J. Chastek Agency, but did not as to its policy written through the Theo. Jensen Agency. All of the other insurance companies interested also became parties to the agreement forming the narrows bridge loss committee. The loss committee incurred expenses on behalf of the various companies, including the F & G, who had become its members, and proceedings had by the committee proceeded as though the F & G were on risk for fifty thousand dollars and the Millers on the risk for only fifty thousand dollars.

On November 14, 1940, the F & G advised LaBow that the F & G would adjust the loss under its binder instead of issuing a policy.

The F & G does not question the authority of their agent in issuing the binder in question nor the validity

and binding effect of such a binder in general. Their position is that, had the binder been for additional or independent insurance, they would be liable. However, they contend that the binder was for insurance to take the place of the Millers' coverage, and that, in as much as the purported cancellation thereof was unauthorized, the Millers were still on the risk at the time of the loss; that, since only one of them would be liable, they were not yet on the risk at the time of loss. As stated in F & G's brief:

"The ultimate question in this case is whether the Millers' policy had, or had not, been cancelled and the F & G letter binder substituted therefor at or before the loss by collapse of the bridge on November 7, 1940."

The whole case turns upon the question of authority to cancel the Millers' policy, which includes the scope of LaBow's authority as an agent of the toll bridge authority.

Appellant's assignments of error will be discussed in four groups: *First.* The formal group contend that the court erred (a) in entering judgment against the F & G, (b) in dismissing the Millers, and (c) in denying the F & G motion for a new trial. The ruling on these assignments must conform to the ruling on the remaining assignments and hence will not be discussed separately.

*Second.* The group of assignments of error directed to the inadmissibility of evidence contend that the court erred in admitting evidence, written or oral, of (a) negotiations prior to the effective date of the Millers' policy, (b) what was said and done by Winston or LaBow inconsistent with the resolution of the authority of July 14, 1939, authorizing L. V. Murrow and P. H. Winston to secure insurance on the bridge, the letter of the authority of June 26, 1940, appointing LaBow

as broker, and the IMUA form attached to the Millers' policy.

The situation back of this group of assignments of error is that the Millers' policy contained a sixty-day cancellation clause. They had served the sixty-day notice of cancellation, but the sixty days had not elapsed when the loss occurred. Previously, however, they had informed LaBow that they wanted to get off the risk. He had proceeded to secure the F & G binder, after which he waived the sixty-day clause and canceled the policy forthwith and within the sixty days, and substituted the F & G binder for the same amount of insurance. It will be remembered that it is the *binder* upon which the F & G were held liable. F & G admit its validity, but challenge LaBow's authority to cancel the Millers' policy.

■■ Appellant objects to the evidence that is inconsistent with the resolution of July 14, 1939: the letter of June 26, 1940, and the IMUA form. These are all extrinsic of the binder sued upon, and, if the parol evidence rule applied, would be barred equally with the evidence claimed to be inconsistent therewith.

The whole question of the authority of the agent was extrinsic to the instrument sued on. It could not be questioned even by appellant without going outside the instrument.

"Parol evidence which tends to confirm the writing has been held admissible. The broad rule is stated that the parol evidence rule does not, in a controversy between the parties, forbid the use of parol evidence to establish any fact that does not vary, alter, or contradict the terms of the instrument or the legal effect of the terms used." 20 Am. Jur. 963, § 1099.

The evidence objected to was admissible and not in violation of the parol evidence rule.

■ *Third.* The group of assignments of error directed to the findings of fact by the court contend that the court erred in finding (a) that the authority "was aware of what Mr. LaBow was doing, authorized it, or at least, did not repudiate it"; (b) that the F & G had full knowledge of the facts under which its binder was issued, it received or retained the premium, extended the time for filing proof of loss, authorized settlement of loss, or demanded appraisal thereof; (c) retained the premium for the letter binder; (d) that Winston or LaBow made or attempted to make a cancellation or substitution agreement.

In the light of our holding that the evidence, objected to under the preceding group of assignments of error, was admissible, the record reveals ample evidence to sustain the court's findings of facts objected to in this group of assignments.

*Fourth.* The group of assignments of error directed to the court's conclusions of law contend that the court erred in concluding that (a) Winston and/or LaBow had authority to make an agreement of cancellation or substitution; (b) that the risk under the binder attached; (c) that what LaBow did bound the authority "when it was done with the consent and knowledge of the secretary" or otherwise; and (d) that the cancellation could not be made without the assent of the bank.

The theory back of this group of assignments of error is that the Millers' policy had a sixty-day notice of cancellation clause; that the loss occurred before the sixty days had elapsed; and that the agents for the authority had no authority to waive the sixty-day clause and cancel the policy forthwith; and that therefore the F & G were off the risk, because the Millers were still on it.

■ It was for the purpose of establishing the scope of the authority of the agent that the evidence was

introduced that appellant objected to as being in violation of the parol evidence rule, in the second group of assignments of error. Having held that evidence to be admissible, it constitutes an ample basis for holding that the agent did have authority to cancel the Millers' policy forthwith. The sixty-day cancellation clause was for the benefit of the assured and could of course be waived by the authority. This, it did by its authorized agent.

 However, there is a better and more conclusive ground upon which the question of the agent's authority can be decided. That is upon the theory of ratification by the principal rather than the original authority of the agent. Let it be noted at the outset that this is not the usual question of an agent's authority, where a principal defends an action by denying the authority of his agent to bind him. There the principal denies that a contract ever existed because he did not authorize it to be made, and, not being his act, he is not bound by it. Here the principal concedes his own agent's authority to bind him, and that he did bind him, but challenges the authority of the agent of the adverse party.

The rule as stated in 2 Am. Jur. 170 is:

"The definite weight of authority is to the effect that the principal, by ratifying the unauthorized contract of his agent, validates the act as though it were originally authorized, with the consequence that the person who dealt with the agent is bound by the transaction with him."

*Western Timber Co. v. Kalama River Lbr. Co.*, 42 Wash. 620, 85 Pac. 338, 6 L. R. A. (N.S.) 397, 114 Am. St. 137, is cited in the footnotes of the foregoing citation as being in support of the majority rule. In that case, the court said:

"It is further contended by respondent that, as Mr. Turrish was not an officer or director of the appellant

corporation, he was without authority to contract in its behalf. It appears that the acts of Mr. Turrish were ratified by the appellant corporation, in that it executed and its officers and stockholders endorsed the promissory notes for the deferred payments of purchase money. It has at all times been ready to make the cash payment, deliver said notes, and perform the contract on its part. The record fails to show that respondent ever made any demand of performance, nor does it show any refusal by appellant. *Appellant has again ratified the acts of Mr. Turrish by its prompt procedure in bringing and prosecuting this action.* Mr. Turrish is shown to have been the principal stockholder of the appellant corporation, to have acted as its manager, and to have at all times controlled its business policy. The claim of want of authority upon his part seems to have been an afterthought, conceived by respondent for the purpose of escaping liability in this action. We think it is in no position to make any such contention." (Italics ours.)

It would therefore appear that the bringing of the instant action constituted a ratification of LaBow's acts that would be binding upon the appellant.

The bank, as escrow holder of the proceeds from the insurance on the bridge for the use of the bondholders and others, had no interest in the question at issue nor authority in the matter of writing or canceling the insurance in question. Its assent was not necessary.

The judgment is affirmed.

SIMPSON, C. J., MILLARD, STEINERT, and JEFFERS, JJ., concur.

---

May 12, 1943. Petition for rehearing denied.