ROGER JUREK v. DARROLD THOMPSON.

241 N. W. 2d 788.

April 16, 1976—No. 45643.

*Wiese & Cox, Paul G. Neimann,* and *Denis E. Grande,* for appellant.

*Norton, Jergens, Hebert & Cass,* and *W. E. Jepsen,* for respondent.

Heard before Kelly, MacLaughlin, and Yetka, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

Defendant, Darrold Thompson, appeals from an order denying his motion for judgment notwithstanding the verdict or for a new trial in this action for breach of two agreements to sell corn to plaintiff, Roger Jurek. We reverse.

Plaintiff is a farmer, trucker, harvester, and investor in grain. Defendant is a farmer. On February 21, 1973, plaintiff and defendant entered into an oral contract by telephone for the sale of 10,000 bushels of defendant's corn to be delivered in July. Defendant was to receive $1.50 per bushel and was to pay plaintiff 11 cents per bushel for hauling the corn. Plaintiff testified that immediately after talking with defendant, he called the Grain Terminal Association (GTA) in St. Paul and obtained a contract from it to deliver 20,000 bushels of corn (10,000 of defendant's and 10,000 to two other parties) in July at $1.50 per bushel. Plaintiff and defendant did not discuss payment or the involvement of GTA, or any third party, in the contract.

Sometime in April 1973, plaintiff offered, and defendant agreed, to haul defendant's corn early at a price reduction of 2 cents per bushel to $1.48. Thereafter, plaintiff picked up from defendant approximately 6,000 bushels of corn and transported it to GTA in Superior, Wisconsin. Plaintiff paid defendant $1.48 per bushel, less certain grading discounts imposed by GTA. Defendant in turn paid plaintiff 11 cents per bushel for hauling the corn.

Plaintiff testified, however, that he had received only $1.30 per bushel for the corn from GTA. Thus, he received nothing for hauling and lost approximately 7 cents per bushel on the corn. However, he testified that he had shipped defendant's corn in April rather than some of his own corn and that he expected to get the price difference back when he shipped his own corn in July. In other words, plaintiff was engaged in numerous transactions with GTA and merely substituted to allow defendant's early delivery. He also indicated that he had charged defendant 2 cents

per bushel for inconvenience and interest because he was holding his own corn longer.

The remaining 4,000 bushels on this transaction were never delivered because of a dispute arising in the second transaction as described below.

In mid-April, while plaintiff was picking up corn from defendant on the first transaction, they had a conversation during which defendant indicated that he wanted to clear $1.50 per bushel on any other corn he sold. Plaintiff testified that, because of hauling charges and grading discounts, this would have meant a selling price of $1.60 to $1.70 at the terminal. On or about April 12, 1973, plaintiff and defendant discussed selling defendant's corn for a lower price of $1.48 per bushel. On April 13, plaintiff called defendant and informed him that the price had gone down to $1.46. There is a great deal of dispute regarding this conversation. Plaintiff testified, and the jury could have believed, that defendant agreed to sell 15,000 bushels of corn at $1.46 on the same terms as the first transaction, saying, "We have to get rid of it, you take care of it." Defendant denies agreeing to sell his corn at $1.46 per bushel and states that he maintained at all times his "$1.50 clear" position. After calling defendant, plaintiff called GTA, found out the price was $1.47 per bushel, and agreed to sell 25,000 bushels (15,000 of defendant's and 10,000 of another party's) at that price. Plaintiff maintains that his only compensation was to be 11 cents per bushel for hauling—the same as the first transaction.

In June, plaintiff suspected defendant of selling corn that plaintiff claimed had been contracted to him to another party. He confronted defendant with this possibility and, according to plaintiff, defendant put him off several times after promising to discuss the problem further. Defendant denied this, maintaining that he told plaintiff there was no *second* transaction. Defendant also testified that they discussed the remaining 4,000 bushels on the first transaction and that defendant had refused to deliver

because plaintiff had refused to pay cash for the 4,000 bushels and had threatened to use the proceeds as a setoff on the second transaction. Plaintiff admitted stating his intention to apply such proceeds as a setoff.

At trial plaintifff attempted to prove damages resulting from defendant's failure to deliver 19,000 bushels of corn in accordance with the two transactions. The testimony and exhibits regarding damages were contradictory and very confusing, due chiefly to the failure of plaintiff to keep adequate records of his business transactions. Since our decision renders consideration of damages unnecessary, the evidence regarding damages will not be discussed.

The jury returned a verdict finding: (1) A sale of 19,000 bushels of corn by defendant to plaintiff; (2) that plaintiff was defendant's *agent* in the sale of that corn; (3) that plaintiff sustained damages of $3,840 on the first transaction and $14,723 on the second transaction, or $18,563.

Three issues are dispositive of this appeal: (1) Was the jury's finding of agency supported by the evidence? (2) Was the second agreement unenforceable under the statute of frauds in Minn. St. 336.2—201? (3) Was the first agreement repudiated by plaintiff?

Defendant challenges the sufficiency of the evidence to support the jury's finding that plaintiff was defendant's agent in the sale of the corn. We sustain that challenge and further hold that there was no agency as a matter of law. The issue of agency was submitted to the jury because plaintiff amended his complaint on the morning of trial to alternatively allege agency as well as a contract for the sale of goods between the parties. This maneuver was apparently designed to avoid the application of the statute of frauds found in Minn. St. 336.2—201 to bar plaintiff's action. Defendant's counsel vigorously impeached plaintiff's testimony, using his sworn answers to interrogatories

asserting only sales by defendant to plaintiff,[1] but the jury returned a special verdict finding both sale and agency and the

[1] Plaintiff's original complaint alleged in part: "That plaintiff and defendant entered into a contract whereby the defendant would sell to the plaintiff and the plaintiff would purchase 10,000 bushels of corn at $1.50 per bushel.

"That this contract was subsequently amended to add an additional 15,000 bushels which defendant would sell and the plaintiff would purchase at a price of $1.47 per bushel."

Some of the interrogatories and answers are as follows:

"25. Did you or any of your representatives receive from Defendant or any of his representatives any communication which you understood to be a binding offer to amend the alleged contract to add an additional fifteen thousand bushels of corn at the price of $1.47 per bushel?

"[Answer]   Yes.

"If so, state:

"a.   The manner in which the offer was made.

"[Answer]   Oral communication between the parties hereto.

"b.   The name and address of the person who made the offer.

"[Answer]   Defendant above named.

"c.   The name and address of each person who received the offer.

"[Answer]   Plaintiff above named.

"d.   The date the offer was received.

"[Answer]   April 13, 1973.

"e.   To whom the offer was addressed.

"[Answer]   The offer was addressed to the plaintiff above named.
* * *

"26.   On or about the end of March, did you agree to *purchase* and pick up and accept delivery; in early April of ten thousand bushels of corn?

"[Answer]   Yes, this is the same contract as above described only the date of delivery of the corn was changed.

* * * * *

"29.   With regard to the amendment to the alleged contract referred to in Paragraph II of the Complaint, state when and how Defendant accepted Plaintiff's alleged offer to buy an additional fifteen thousand bushels of corn.

"[Answer]   It was not plaintiff's offer to buy corn, it was de-

trial court adopted the verdict and ordered judgment for plaintiff.[2]

The existence of an agency relationship is a question of fact. Agency is defined in Restatement, Agency 2d, § 1, as—

"* * * the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

See, Tonka Corp. v. Commr. of Taxation, 284 Minn. 185, 169 N. W. 2d 589 (1969). The question in the instant case is whether there is an agency relationship or some other kind of relationship, between the parties.

The essential elements of the relationship between the parties in this case are as follows: (1) Defendant agreed to sell and plaintiff agreed to buy specified quantities of corn at specified prices. Defendant received the full agreed price and plaintiff was paid a fee for handling the corn. (2) There were no discussions about resale to or involvement of any third parties when the

---

fendant's offer to sell corn that was accepted by plaintiff.

\* \* \* \* \*

"31. State the following:

\* \* \* \* \*

"c. What was said or done by Plaintiff at the time [the offer] was received?

"[Answer] In reliance upon defendant's offer to sell corn to the plaintiff, the plaintiff committed himself to deliver a like amount of corn to Farmer's Union Grain Terminal Association." (Italics supplied.)

[2] Because of our holding that there was no agency, we need not reach the additional questions: (1) Whether the jury's findings of agency and sales contracts are inconsistent and irreconcilable on these facts; or (2) whether in the hybrid sale-agency transactions the jury found here the statute of frauds might nonetheless apply. Bender's UCC Serv., Duesenberg & King, Sales and Bulk Transfers, § 2.02(1), p. 2-15, suggests: "If an agent in fact purchases and then resells, the contract may be within the statute; the same is true where a broker sells stock which he already owns."

agreements were made. However, plaintiff did testify that at one point, in response to defendant's demand for a written contract, plaintiff had shown defendant a contract with GTA regarding the first transaction. Defendant denied ever seeing such a document. (3) Plaintiff did not act as a mere conduit between defendant and GTA on the first 6,000 bushels; plaintiff did not forward to defendant the GTA price, but a greater price, which he hoped to recoup by holding his own corn longer. Plaintiff also made an inconvenience deduction for doing this. (4) Plaintiff sold under his own name to GTA.[3]

Clearly, this relationship is not agency. First, there is no manifestation of defendant's consent that plaintiff be his agent in the resale of corn. There is, at most, a manifestation that plaintiff pick up defendant's corn and pay him an agreed price. Agency cannot be proved solely by the acts or declarations of the assumed agent—the will of the principal must be expressed or implied from the circumstances. See, 1A Dunnell, Dig. § 149. While there is some evidence that defendant knew GTA was involved *after* the contract for the first transaction was made and that he knew his price on the first transaction was reduced for quality by *someone*, this evidence is not persuasive when examined in light of the entire transaction.

Second, and more important, the critical element of defendant's right of control over plaintiff in the sale of the corn is totally lacking. Restatement, Agency 2d, § 1, Comment *b* states:

"* * * The agency relation results if, but only if, there is an

---

[3] As pointed out in defendant's brief: "* * * The Farmer's Union Grain Terminal Association paid plaintiff; defendant's name never appeared on a contract or on a check in any capacity. The sale contracts * * * are all between Farmer's Union Grain Terminal Association and the plaintiff, Roger Jurek, not 'Roger Jurek, agent for D. R. Thompson' or 'Roger Jurek and D. R. Thompson' * * *. Payment was made by Farmer's Union Grain Terminal Association to plaintiff alone * * *. All payments to defendant Thompson were made by plaintiff on his own personal checks. * * * Defendant never received a check from or in any way related to Farmer's Union Grain Terminal Association."

understanding between the parties which, as interpreted by the court, creates a fiduciary relation in which the fiduciary is subject to the directions of the one on whose account he acts. It is the element of *continuous subjection to the will of the principal* which distinguishes the agent from other fiduciaries and the agency agreement from other agreements." (Italics supplied.)

Once the contracts were formed, defendant had no control over any phase of plaintiff's operations. Defendant merely surrendered the corn and was paid. While strict right of *physical* control[4] is not necessary, there must be at least some element of control and a fiduciary relationship before agency can be established. See, Restatement, Agency 2d, §§ 14, 14 N; Tonka Corp. v. Commr. of Taxation, 284 Minn. 185, 169 N. W. 2d 589 (1969); Derrick v. The Drolson Co. Inc. 244 Minn. 144, 69 N. W. 2d 124 (1955); Dunn v. Loan Midland Finance Corp. 206 Minn. 550, 289 N. W. 411 (1939); Lee v. Peoples Co-op. Sales Agency, Inc. 201 Minn. 266, 276 N. W. 214 (1937). The relationship in this case is more aptly characterized as (1) the sale of services (hauling) by a nonagent independent contractor[5] and (2) the

---

[4] The jury in this case was erroneously instructed that *physical* control over the agent was necessary to establish agency. The court apparently based its instruction on 4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides (2 ed.) JIG II 250, which (1) applies only to tort actions, and (2) misquotes as authority parts of Restatement, Agency 2d, to support its instruction. This instruction favored defendant, however, since there was no evidence of any such control. If the jury had followed the instruction, it could not possibly have found agency.

[5] Comment *b* to Restatement, Agency 2d, § 14 N, describes the nonagent independent contractor as follows: "*b. Non-agent independent contractor.* A person who contracts to accomplish something for another, * * * but who is not acting as a fiduciary for the other, is a nonagent contractor. He may be anyone who has made a contract and who is not an agent. The term is used colloquially to describe builders and

sale of goods.[6]

In summary, the jury could not properly have found agency. In the absence of any persuasive evidence of manifestation of

others who have contracted to accomplish physical results not under the supervision of the one who has employed them to produce the results."

The contrary relationship, the agent independent contractor, is distinguished on the ground that the parties are in a fiduciary relationship and the principal retains some right of control, although not necessarily a right of *physical* control over the agent independent contractor's performance. Restatement, Agency 2d, § 14 N, comment *a*. Plaintiff might have provided a delivery or hauling service to defendant for 11 cents a bushel within the meaning of Comment *b*.

[6] Restatement, Agency 2d, § 14 J, distinguishes between an agent and a buyer: "One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction: whether he is an agent for this purpose or is himself a buyer depends upon whether the parties agree that his duty is to act primarily for the benefit of the one delivering the goods to him or is to act primarily for his own benefit."

The test is vague, but Comment *b* to that section provides a helpful set of criteria for distinguishing between agency and sale:

"*b. Indications of a sale.* In the ordinary case the distinction between a buyer and an agent is clear, but for any of a number of reasons it may be desirable to create a relation which has some of the elements * * * of an agency. The typical difficult case is that of a 'sale on consignment', which may be an immediate sale, or a sale to the consignee when the goods are sold by him to a third person, or an agency. The following factors indicate a sale although no one factor is determinative:

"(1) That the consignee gets legal title and possession of the goods. However, one can transfer legal title to an agent so that he can deal more freely with the subject matter. On the other hand, there are situations in which a jobber or wholesaler never acquires title to the goods, as where he directs the seller to deliver the goods directly to the ultimate purchaser. In situations of this sort, other criteria must be used in order to determine whether there is a sale or an agency relation.

"(2) That the consignee becomes responsible for an agreed price, either at once or when the goods are sold. In the latter case, the transferee is a bailee with power to acquire title for himself. Again, this element may not be determinative, since there may be an agency with a

consent, right of control, and fiduciary relationship, there is no agency as a matter of law. However, the jury's finding of a sale is supported by the evidence and will not be overturned.

■ Since the relationship of plaintiff and defendant was properly characterized by the jury as a contract for the sale of goods, the issue of the applicability of the statute of frauds in Minn. St. 336.2—201 becomes relevant. That statute provides:

"(1) Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing suf-

---

guarantee by the agent that sales will be made and that the purchaser will pay; this places the risk upon the agent to the same extent as if he were the purchaser. On the other hand, one who buys the goods may have a right to return unsold goods.

"(3) That the consignee can fix the price at which he sells without accounting to the transferor for the difference between what he obtains and the price he pays. Again, this factor is not determinative, since an agent may be allowed to fix the selling price and keep the difference as compensation, whereas on the other hand, a seller may contract with a buyer that the latter is to sell at a fixed price.

"(4) That the goods are incomplete or unfinished and it is understood that the transferee is to make additions to them or to complete the process of manufacture.

"(5) That the risk of loss by accident is upon the transferee.

"(6) That the transferee deals, or has a right to deal, with the goods of persons other than the transferor.

"(7) That the transferee deals in his own name and does not disclose that the goods are those of another."

Application of these criteria to the facts in the instant case results in a finding of a sale: (1) Plaintiff arguably received legal title and possession when he picked up the corn, Minn. St. 336.2—401; (2) plaintiff was responsible for the agreed price from the outset; (3) plaintiff apparently did not have to account to defendant for the price plaintiff received—he was only responsible for the agreed price; (4) risk of loss was probably on plaintiff from pick-up time; (5) plaintiff was dealing in the corn of many other farmers; (6) plaintiff dealt with GTA in his own name. See, DeGidio Oil & Gas Burner Sales & Service, Inc. v. Ace Engineering Co. Inc. 302 Minn. 19, 225 N. W. 2d 217 (1974).

ficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

"(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

"(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

"(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

"(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

"(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (section 336.2—606)."

Defendant in the instant case admitted the existence of the first agreement in the amount of 10,000 bushels, and admitted that he had delivered only 6,000. Thus, an action on the first agreement is permitted under § 336.2—201(3)(b). However, defendant staunchly denied the existence of the second agreement, and the statute of frauds therefore applies to bar plaintiff's action on that agreement. See, Sacred Heart Farmers Co-op. Elevator

v. Johnson, 305 Minn. 324, 232 N. W. 2d 921 (1975) ; Del Hayes & Sons, Inc. v. Mitchell, 304 Minn. 275, 230 N. W. 2d 588 (1975). The portion of the judgment granting damages for breach of the second agreement must be reversed.

■ As to the first agreement, defendant argues that plaintiff repudiated their 10,000-bushel contract by refusing to promise to pay defendant for the 4,000 bushels that remained to be delivered and stating he would instead withhold the price of that 4,000 bushels as a setoff against the second agreement. Plaintiff admitted this, testifying as follows:

"Q. Okay. Then what was the remaining portion of that, of your conversation with him?

"A. Well, he asked if I was thinking of holding up any of that money and I told him that I might. And he wouldn't settle for that; he says, yes or no, will you? And I said, yes, I would hold that money in settlement for the bad contract."

Plaintiff argues that this was not repudiation but assertion of a right of setoff under Minn. St. 336.2—717. That section provides:

"The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due *under the same contract*." (Italics supplied.)

U. C. C. Comment 1, 21A M.S.A. p. 744, further emphasizes the same contract requirement: "* * * To bring this provision into application the breach involved must be of *the same contract* under which the price in question is claimed to have been earned." (Italics supplied.) Plaintiff wrongfully asserted a right to setoff between the contracts. Defendant interpreted plaintiff's statement as a wrongful refusal to pay on the contract and could justifiably have withheld delivery. Minn. St. 336.2—610; 336.2—703. The portion of the judgment granting damages on the first agreement must also be reversed.

Since we have held that both portions of the judgment must

be reversed, the case is remanded to the trial court with instructions to enter judgment for defendant.

Reversed and remanded with instructions to enter judgment for defendant.