UNIQUE SYSTEMS, INC., and Duane F. Lilja, Plaintiffs-Appellees and Cross-Appellants,

v.

ZOTOS INTERNATIONAL, INC., Defendant-Appellant and Cross-Appellee.

Nos. 79–2066, 80–1013 and 80–1122.

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1980.

Decided May 23, 1980.

Rehearing and Rehearing En Banc Denied June 17, 1980.

Harold D. Field, Jr., Leonard, Street & Deinard, Minneapolis, Minn., argued, and Nancy C. Dreher, Minneapolis, Minn., on brief, for defendant-appellant and cross-appellee.

Robert J. Hennessey, Larkin, Hoffman, Daly & Lindgren, Minneapolis, Minn., for plaintiffs-appellees and cross-appellants.

Before HEANEY and ARNOLD, Circuit Judges, and SACHS,* District Judge.

ARNOLD, Circuit Judge.

This appeal arises out of a contract dispute between plaintiffs, Unique Systems, Inc. (Unique), and Duane F. Lilja (Lilja), and defendant Zotos International, Inc. (Zotos). Zotos appeals a judgment entered on November 29, 1979, for $398,760.00 in favor of plaintiffs. Zotos also appeals an order dated February 7, 1980, wherein the judgment was modified by changing its date of entry to November 30, 1978, *nunc pro tunc.* Unique and Lilja appeal the denial of recovery of lost profits for the third and fourth year of the contract and the denial of prejudgment interest. We affirm.

This case was originally brought in the District Court of Hennepin County, Minnesota, and was removed by Zotos to the United States District Court for the District of Minnesota. The case was tried before the Honorable Robert G. Renner, United States Magistrate (now United States District Judge), pursuant to a stipulation and order of reference providing for Magistrate Renner to serve as master, with direct appeal, if any, to this Court. On November 30, 1978, Magistrate Renner issued his Findings of Fact and Conclusions of Law, a Recommended Order for Judgment, and a Memorandum Opinion. United States District Judge Miles W. Lord adopted this Order on the same day, and judgment was entered accordingly. After cross-motions for amendments had been made, on March 5, 1979, the Magistrate issued an Order for Amended Findings and Conclusions, an

---

* The Hon. HOWARD F. SACHS, United States District Judge for the Western District of Missouri, sitting by designation.

Amended Recommended Order and another Memorandum Opinion. This Recommended Order was adopted by Judge Lord on March 9, 1979.

Zotos filed a notice of appeal on April 2, 1979. Unique and Lilja filed a notice of cross-appeal on April 11, 1979. On May 15, 1979, while the appeal and cross-appeal were pending, this Court decided *Duryea v. Third Northwestern National Bank*, 602 F.2d 809 (8th Cir. 1979). In *Duryea* the Court determined that an order of reference to a magistrate could not properly provide for direct appeal to this Court, and that a district court's judgment entered on the magistrate's recommended findings was deficient if it failed to indicate that the court had considered and adopted the magistrate's conclusions of law. After counsel for plaintiffs and defendant advised the Court that the Order of Reference used in this case was substantially identical to that found to be defective in *Duryea*, this Court entered an Order remanding for reconsideration in light of *Duryea*. After a hearing and submission of briefs, Judge Lord issued an Order wherein he confirmed, without change, the Magistrate's Conclusions. On November 29, 1979, a new judgment was entered against Zotos in the same amount as the first judgment. Notices of Appeal and Cross-Appeal were again filed.

On December 3, 1979, counsel for plaintiffs wrote a letter to Judge Lord requesting that he amend the second judgment *nunc pro tunc* so as to make it effective November 30, 1978, the date of Magistrate Renner's first Recommended Order. Zotos opposed the request by letter of December 6, 1979. By Order of January 18, 1980, this Court remanded the appeal from the second judgment for the limited purpose of permitting Judge Lord to rule on the letter request and thereby determine "what interest on the judgment petitioner is entitled to" (Designated Record [D.R.] 1038). On February 7, 1980, Judge Lord issued an order changing the date of entry of the second judgment from November 29, 1979, to November 30, 1978, *nunc pro tunc*. Zotos now appeals that action.

## I. Facts

The contract which is the subject of this case was signed January 30, 1974, and amended by letter on February 21, 1974. Lilja is the holder of a patent on a multi-station hair-spray system intended for use in beauty salons. Zotos is a major manufacturer and distributor of "soft goods" (shampoos, permanents, and setting lotions) to the professional beauty field. Neither party had experience in the manufacture of hair-spray systems or any other type of beauty-salon equipment.

Under the contract Lilja and Unique Systems, Inc., were to develop, manufacture, and place in inventory hair-spray systems. Zotos was to purchase the systems for resale through its nationwide system of wholesale distributors. The original contract of January 30, 1974, set up a timetable for Lilja to stock the systems and Zotos to pay for them. The contract obligated Zotos to buy 15,000 systems over a period of two years with the option to buy at least 7,500 systems in each of years three and four. In the contract as amended the parties agreed that actual stocking and distribution of the systems would commence with "month one," defined as a "mutually agreed date in the year 1974."

These changes in the agreement were made at Zotos's instigation. Zotos feared that the current oil shortage would make it impossible to obtain a sufficient supply of alcohol needed for the manufacturer of the liquid spray Zotos was required to develop and supply for the systems. Lilja agreed to the changes in schedule. At the time, February of 1974, both parties were confident that "month one" could be set before the end of the year.

At the time the contract was signed, Lilja's hair-spray system was still in the design and development stage. During 1974 Lilja made several design changes which were approved by Zotos. During that year several unanticipated delays occurred, some of which were the fault of Lilja, some the fault of Zotos, and some the fault of third parties. By January of 1975 month one still

had not been set, and neither party to the agreement had completed the steps necessary to market the system.

In a series of letters and telephone conversations during early 1975, Lilja repeatedly told Zotos that he was ready to set a schedule for marketing the systems and was ready for Zotos to "place an order." He also suggested some changes in the number of systems in the initial order and in the place of initial distribution. Other companies had introduced similar hair-spray systems into the market by this time, and Zotos began to fear a softening of the market. Zotos also began expressing fears about the mechanical viability of the system. In conversations with Lilja, Zotos's representatives insisted that the company would not place an order for any systems until they had seen a demonstration of finished sample components.

Lilja's reaction to Zotos's waivering commitment was to continue to insist that Zotos "place an order" for the initial purchase of systems. The parties agreed to meet in July of 1975 at Zotos's main offices in Darien, Connecticut, to discuss all problems. At that meeting, Lilja demonstrated the system, which was by this time complete except for a prototype bottle holder made partially of wood. The demonstration was successful except for a minor problem with a dripping needle. Zotos's representatives agreed orally that the system as demonstrated met the warranty requirements of the contract, but they refused to put their agreement in writing unless Lilja would agree to a market test of completed systems. Written proposals and counter-proposals were made, but no agreement was reached. Lilja met with Zotos's personnel again in Chicago on August 3. Zotos again insisted on a test market. In light of Zotos's refusal to proceed without the market test period, Lilja considered the contract repudiated. He so notified Zotos and filed suit soon after.

## II. The Issue of Repudiation

■ Appellant's major contention on appeal is that the trial court erred in finding that Zotos repudiated the contract. We disagree. After a careful review of the record, including the transcript of the 23-day trial, we have concluded that the District Court's findings are supported by substantial evidence and are not clearly erroneous. We also conclude that it applied the correct legal standard to the facts.

In its Conclusions of Law the Court held: The defendant's actions in refusing to honor its contractual obligations constitute a breach of the contract and a repudiation of the contract between the parties.

There is ample evidence that as early as September of 1974 Zotos had decided not to comply with the contract as written. In the ensuing months Zotos's actions bore out this intention. Ralph Evans, President of Zotos, refused to authorize the purchase of capping equipment necessary for filling the bottles of liquid fixative. Zotos's representatives communicated to Lilja Zotos's insistence upon a demonstration of the finished sample components, although this was not required by the contract. Whether these acts in early 1975 amount to a repudiation of the contract, we need not decide, because on July 25 and 26, 1975, and again on August 3, after a successful demonstration of the system, Zotos unequivocally refused to perform. At these meetings, Ralph Evans, President of Zotos, made it clear that Zotos would not set "month one" or agree to purchase any systems until an extensive market test could be conducted in the field. Zotos's obligation to continue with the contract would be conditioned upon its approval of the market-test results, a requirement found nowhere in the contract.

■ The rights of the aggrieved party after a repudiation are controlled by Minn. Stat. § 336.2–610.[1] Zotos argues that its actions do not amount to a repudiation of the contract. Anticipatory repudiation occurs only when one party expressly re-

---

1. No one has questioned the application of Minnesota law in this case or suggested that

the result would be different if some other law were applied. *See* Minn.Stat. § 336.1–105.

nounces a contract and announces an intention not to perform. *Jurek v. Thompson*, 308 Minn. 191, 241 N.W.2d 788 (1976). There must, at a minimum, be an "overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Official Comment to U.C.C. § 2–610(1), codified as Minn. Stat. § 336.2–610(1). A secret intention not to perform or a negative attitude does not rise to the level of repudiation. *Teeman v. Jurek*, 312 Minn. 292, 251 N.W.2d 698 (1977). If a party to a contract demands of the other party a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory repudiation has been committed. 4 Corbin, Contracts § 973 (1951). When Zotos told Lilja in August of 1975 that it would not proceed until market tests were performed with results subject to Zotos's approval, Zotos repudiated the contract and was in total breach. No market tests were required by the contract, a fact that Zotos admits that it knew.

■ Zotos argues that even if these acts amount to a repudiation, Lilja had already breached the contract in the spring of 1975 by trying to vary the terms of the contract. A suggestion for modification of a contract does not amount to a repudiation unless the party makes it clear that he will not perform without the modification. No one has even suggested that Lilja threatened not to perform. On the contrary, up until Zotos's actions in August, the record is full of Lilja's attempts to set "month one" and get on with the contract.[2]

Lilja was justified in refusing to go into full production until the setting of "month one." With the setting of "month one," the interdependent obligations of the contract would arise. Lilja would have to have the systems in inventory by the first day of that month, and Zotos would be obligated to pay for the systems fifteen days later, subject to warranty requirements. Zotos was aware from the beginning of negotiations with Lilja in 1973 that he did not have the financial resources to develop the system alone and then find a buyer. As the contract was finally drafted, it gave Lilja assurance that he would have a buyer for the systems soon after their completion.[3] In return Zotos received an exclusive distributorship for a product that it felt had great potential. We agree with the District Court that Lilja was never in breach of the contract. He made a good-faith effort to put it into effect up until the time of Zotos's repudiation in August of 1975.

### III. The Damage Issues

Zotos atttacks the District Court's award of damages as "purely speculative and conjectural." Specifically, Zotos claims that plaintiffs should not recover $278,040.00 in lost profits on the 15,000 hair-spray systems Zotos would have been required to purchase during the first two years of the contract, that the award of anticipated lost profits from the sale of three years' worth of replacement guns and bottle caps for the 15,-

---

**2.** Zotos characterizes Lilja's repeated requests that Zotos "place an order" as a repudiation. The District Court found, and we agree, that the requests were attempts by Lilja to set "month one" and receive assurance that Zotos was still committed to the contract. He had good reason to suspect that Zotos might want out.

**3.** In a telephone conversation on April 21, 1975, Bob Leyden, Marketing Vice-President for Zotos, described the situation as, "You won't proceed until you receive orders. From the company's point of view they don't want to give orders until they see the finished product." (D.R. 136). Under the contract Zotos had no right to require a fully finished production model months in advance of the earliest possible date for payment for the systems. In March and April of 1975, while Zotos was demanding a production model, Ralph Evans, Zotos's President, refused to order the capping equipment necessary for filling the bottles in the finished systems. The lead time, or time between the placing of the order and delivery, was at least fourteen weeks. Zotos was placing Lilja in a financially untenable position by demanding that he proceed as if "month one" had been set, while refusing either to set that date or complete preparations for marketing the system.

000 systems is based on unsubstantiated speculation, and that the amount of damages, if upheld, should be reduced by Unique's saved overhead expenses. Plaintiffs cross-appeal for an award of lost profits for the third and fourth years of the contract. These damage issues will be discussed separately.

Zotos's central contention in its argument against an award of anticipated lost profits on the first two years of the contract is that Lilja's estimates of his expected profit margin on the systems are too speculative to support the award. The contract sets out in Paragraph three the price at which Lilja was to sell the system's component parts to Zotos. Contrary to the District Court's finding, Unique's profit margin was not expressly stated in the contract. Paragraph four, however, gave Unique the right to increase prices to Zotos upon proof of increased costs.[4] It can be said, therefore, that the parties contemplated a fixed margin of profit for Unique based on the difference between the prices to be charged Zotos, as listed in the contract, and Unique's estimated cost of production as of January 30, 1974, with adjustments for increased costs during the life of the contract. Lilja testified that the prices to be charged Zotos were based upon cost bids from suppliers and, for some of the smaller items, his own estimates.[5]

A seller's damages upon repudiation by a buyer are specified by Minn.Stat. § 336.2–708. Subsection (1) provides that the measure of damages is the difference between the market price at the time and place for tender and the unpaid contract price, together with any incidental damages. In cases such as this one, where the measure provided by subsection (1) is inadequate to put the seller in as good a position as per-

formance would have done (there was no "market price" here, since Lilja never got far enough to produce the system in marketable quantities), subsection (2) provides for recovery of profit (including reasonable overhead) which the seller would have made from full performance by the buyer. The Official Code Comment to subsection (2) states in part, "It is not necessary to a recovery of 'profit' to show a history of earnings, especially if a new venture is involved." Minn.Stat. § 336.1–106 provides, "(1) The remedies provided by this chapter shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ."

■ In order to recover for lost profits under § 336.2–708(2) the plaintiffs must prove the amount of damages with a reasonable degree of certainty, that the wrongful acts of the defendant caused the loss of profit, and that the profits were reasonably within the contemplation of the parties at the time the contract was entered into.

■ The burden of proof of lost profits is particularly heavy in the case of a new business. The general rule in Minnesota is that "proof of loss of profits in a new business is too speculative to be the basis for recovery." *Village of Elbow Lake v. Otter Tail Power Co.*, 281 Minn. 43, 46, 160 N.W.2d 571, 574 (1968). It is clear, however, that, given a reasonable basis upon which to figure the amount, a new business can recover lost profits under Minnesota law.

We have adopted no *per se* rule that only an "established business" can recover damages for loss of prospective profits. The controlling principle governing actions for damages is that "damages which are speculative, remote, or conjectural

---

4. Paragraph four for the contract provides: "UNIQUE may increase the above prices of any of the above products, upon not less than 60 days prior written notice to ZOTOS. Such price increase shall reflect increased costs of materials, labor, shipping charges and/or storage incurred, or such other costs incurred as substantiated by UNIQUE to ZOTOS."

5. Of the forty-odd components or operations required to produce the system, fourteen were estimated, and the rest were based on cost bids. The estimated component costs represented only 3.3% of the total cost of the system. Two of Lilja's suppliers testified as to the reliability of their respective bids and as to the standard practice of relying on such bids as a method of determining cost.

are not recoverable." . . . The law does not require mathematical precision in the proof of loss but only proof to a "reasonable, although not necessarily absolute, certainty" . . . Once the fact of loss has been shown, the difficulty in proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount. . . .

*Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn.1977) (citations omitted).

█ There is more certainty here than in many "new business" cases. Zotos was obligated to purchase 15,000 systems over a two-year period no matter what developed in the resale market. There was testimony that a market did indeed exist for the systems up through 1977. The court below found that Lilja's system was a substantial improvement over the existing state of the art. Of particular interest is the fact that Zotos's own expert witness testified that he had attempted to buy the rights to Unique's system as late as 1977. There was no error in the District Court's finding that plaintiffs had proved damages to the required degree of certainty on the 15,000 systems covered by the first two years of the contract.[6]

Zotos next argues that the award of damages for lost profits on replacement parts is not supported by substantial evidence. We do not agree. Although there was conflicting evidence as to the life-span of the hair-spray systems, the number of bottles of spray to be used monthly by each system, the life of the applicator gun, and the likelihood that some systems would fall into disuse, the District Court chose a reasonable and conservative path through the maze of evidence in setting a three-year life for the system and the rate of replacement for parts. Unique had requested much more

extensive damages for profits on replacement parts, and it is possible that it could have sold many more parts than it will be compensated for by this award. The award for lost profits on replacement parts is supported by substantial evidence.

Zotos also argues that the damage award should be reduced to reflect certain direct and indirect expenses that it claims were not incurred by Unique as a result of Zotos's repudiation of the contract. Zotos's contention that Unique ceased to exist as a business enterprise is based on the fact that the hair-spray system had not been successfully marketed at the time of trial.

Minn.Stats. § 336.2–708(2) provides for the recovery of gross profits, including reasonable overhead. Under that rule no deduction from damages for overhead expenses is required. Zotos argues, however, that a plaintiff who discontinues his business after a breach of contract is not entitled to recover overhead expenses which would have been incurred had the business continued. Annot., 3 A.L.R.3d 697 (1965); *French v. Pullman Motor Car Co.*, 242 Pa. 136, 88 A. 876 (1913). This may be the rule, but there is no proof in the record that Unique Systems, Inc., has ceased to exist. Apparently Zotos did not attempt to establish this fact at trial. Lilja testified at length as to his continuing efforts to market the system and keep Unique afloat. We see no basis upon which to reduce the damage award for saved overhead expenses.

### IV. Prejudgment Interest

█ Plaintiffs challenge the District Court's denial of prejudgment interest. The Minnesota rule is that a plaintiff is entitled to prejudgment interest on a liquidated claim, or on an unliquidated claim if

---

**6.** Plaintiffs cross-appeal from the District Court's denial of damages for lost profits on the third and fourth years of the contract. Plaintiff's basic argument is that by counter-claiming for damages and injunctive relief, defendant has asserted its claim of exclusivity, thereby exercising its option, for the third and fourth years of the contract. We cannot agree. The contract gave Zotos the option of keeping its exclusive-distribution right by meeting certain purchase levels in the third and fourth years. There is no way to determine whether Zotos would have exercised the option. Since "month one" was never set, years three and four never came into being. It cannot be said, therefore, that Zotos has, by asserting a counter-claim, chosen to extend the contract into the third and fourth year.

the claim is ascertainable by computation or reference to generally recognized standards such as market value, and if the claim does not depend on a contingency. *N-Ren Corp. v. American Home Assur. Co.*, 8th Cir., 619 F.2d 784, 789 (1980); *Clements Auto Co. v. Service Bureau Corp.*, 444 F.2d 169 (8th Cir. 1971). The Minnesota Supreme Court has said:

> [The test is] whether defendant could have determined the amount of his potential liability from a generally recognized objective standard of measurement, such as readily ascertainable market value.

*Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 519, 189 N.W.2d 499, 504 (1971). The District Court refused to award prejudgment interest on the basis that the amount of damages could not be ascertained before trial, because the Court had to weigh the evidence presented on the costs of the various components of the spray system. We agree.

It is true that the figures necessary to compute damages on the minimum purchase requirement of 15,000 systems were in existence in January of 1974 when the contract was executed. Lilja testified at trial that the prices set out in the contract were based on bids he had previously received and, in some instances, his own estimates. He argues that his profit margin is, therefore, "ascertainable by computation . . . to generally recognized standards." Plaintiffs ask for prejudgment interest on this part of the damage award, if not the whole award. They ask, alternatively, for interest on the entire award as a matter of "just compensation."

We cannot agree with plaintiffs' positions. The fact that the figures were in existence prior to judgment is not enough to support an award of prejudgment interest.[7] Prejudgment interest is charged against a defendant only when he could

have computed his potential liability with some degree of certainty and when the potential damage award does not depend on a contingency such as a court or jury finding on disputed facts or inferences. In the present case, it was necessary for the District Court first to decide whether damages could be awarded for lost profits on a product which had never been manufactured and did not even exist in finished form. Next the Court had to decide whether the cost bids and estimates upon which Lilja relied in computing his profits were sufficiently reliable to support an award of damages. In the case of the lost profits on replacement parts, the Court had to choose an estimated life span for the systems from strongly conflicting testimony. Each of these steps was a contingency of the type which under Minnesota law prevents the award of prejudgment interest. See *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 189 N.W.2d 499 (1971) (setting of market value of destroyed airplane a matter of jury discretion); *Layne-Minnesota p.r., Inc. v. Singer Co.*, 574 F.2d 429, 435 (8th Cir. 1978) (contingency existed when defendants argued that third parties were responsible for delay in construction contract). The District Court correctly denied prejudgment interest.

## V. Date of Entry of Judgment

■ In a separate appeal, No. 80–1122, Zotos challenges Judge Lord's February 7, 1980, amendment of the judgment changing the date of entry from November 29, 1979, to November 30, 1978, *nunc pro tunc.* Judge Lord's order was in response to this Court's remand order of January 18, 1980, for the limited purpose of determining "what interest on the judgment petitioner is entitled to." The order apparently expresses the District Court's opinion that interest should be allowed from November 30, 1978.

---

7. Zotos had no knowledge of plaintiffs' cost estimates when the contract was executed. Contrary to the District Court's finding, the profit margin was not stated. Plaintiffs' complaint requested damages of "an amount yet undeterminable, but in excess of . . . $500,000.00." Zotos received the cost esti-

mates in January of 1977 in answers to interrogatories, and the profit per system could have been determined at that time. Zotos had no way of knowing, however, how many years of the four years of the contract it would be held liable for.

Zotos relies on various statutes and rules regarding the award of post-judgment interest in civil cases in federal district courts. 28 U.S.C. § 1961; Fed.R.App.P. 37. We do not see this question as simply one of post-judgment interest. It is more nearly a question of whether under Minnesota law plaintiffs are entitled to interest between the time of the Magistrate's first Recommended Order and the clerk's entry of judgment.

Minn.Stats. § 549.09 provides:

When a judgment is for recovery of money, including a judgment for the recovery of taxes, interest from the time of the verdict or report until judgment is finally entered shall be computed by the clerk and added thereto.

The Minnesota Supreme Court recently decided an analogous case. The Court held that under § 549.09 interest is to be computed upon an award of damages by a court-appointed referee from the date of the referee's report, rather than from the later date when the report is adopted by the court. *Pacific Indemnity Co. v. Thompson-Yaeger, Inc.*, 258 N.W.2d 762 (1977). The referee had been appointed pursuant to Minn.R.Civ.P. 53, a provision cognate with Fed.R.Civ.P. 53, under which Magistrate Renner was appointed as master in this case.

Whether this Court's holding in *Duryea v. Third Northwestern National Bank*, 602 F.2d 809 (8th Cir. 1979), rendered the November 30, 1978, judgment defective is not dispositive. Were the plaintiffs relying on 28 U.S.C. § 1961, the situation would be different. That statute provides for post-judgment interest in civil cases in district courts. "Such interest shall be calculated from the date of the *entry of the judgment*, at the rate allowed by State Law" (emphasis supplied). The statute has to do with interest on a judgment only, and not with interest on a debt before it is reduced to judgment.

Section 966, [now 28 U.S.C. § 1961] while providing only for interest upon judgments, does not exclude the idea of a power in the several states to allow interest upon verdicts, and where such allowance is expressly made by a state statute, we consider it a right given to a successful plaintiff, of which he ought not to be deprived by a removal of his case to the federal court.

*Massachusetts Benefit Association v. Miles*, 137 U.S. 689, 691, 11 S.Ct. 234, 235, 34 L.Ed. 834 (1891). In this diversity case where the right of action arises under state law, interest should be accrued from November 30, 1978, the date of Magistrate Renner's Recommended Order for Judgment.[8]

The judgments are affirmed in all respects.

---

**8.** Plaintiffs correctly point out that had Judge Lord followed Minn.Stats. § 549.09 literally they would have been entitled to interest from November 30, 1978, to be added to the amount of the judgment rendered November 29, 1979. From that date they would be accruing interest upon that interest. They have not asked for such a correction.