## ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Appellee,

### v.

## FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver of the State Bank of Greenwald, Minnesota, Appellant.

### v.

## Douglas A. WINTER; Bernadine Winter; Robert J. Osendorf, Appellants.

### No. 91–2656.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1992.

Decided July 2, 1992.

Rehearing Denied Aug. 18, 1992.

---

Edward J. Pluimer, Minneapolis, Minn., argued (Brian E. Palmer, John A. Cooney and Charles R. Shreffler, Minneapolis, Minn. and Robert A. Patrick, Washington, D.C., on the brief), for appellant.

Norman R. Carpenter, Minneapolis, Minn., argued, for appellee.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

McMILLIAN, Circuit Judge.

The Federal Deposit Insurance Corp. (FDIC), as receiver for the State Bank of Greenwald (bank), appeals from a final order entered in the District Court[1] for the District of Minnesota granting summary judgment in favor of St. Paul Fire & Marine Insurance Co. (St. Paul). *St. Paul Fire & Marine Insurance Co. v. FDIC*, 765 F.Supp. 538 (D.Minn.1991) (*St. Paul*). For reversal the FDIC argues the district court erred in granting summary judgment because (1) there are disputed issues of material fact about the adequacy of the notice of certain exclusions from coverage, (2) the regulatory exclusion is ambiguous, and (3) the regulatory exclusion violates public policy. For the reasons discussed below, we adopt the district court's well-reasoned analysis and affirm the order of the district court.

The following statement of facts is taken in large part from the memorandum opinion of the district court. The bank was established in 1910. In 1965 Clarence "C.P." Winter, a long-time bank officer, and Lyle Olmscheid acquired the bank. C.P. Winter apparently bought out Olmscheid's interest in the bank in 1972. In 1978 C.P. Winter formed a bank holding company. C.P. Winter and his wife, Bernadine Winter, owned 96% of the stock of the bank holding company. The bank holding company owned 84% of the stock in the bank. The Winters also acquired an insurance agency located at the bank. St. Paul was one of the insurance carriers represented by the insurance agency.

The bank's board of directors and officers consisted of C.P. Winter as president, Bernadine Winter as executive vice-president, and Robert J. Osendorf as vice-president. Osendorf was also the manager of the insurance agency. After C.P. Winter's death in 1983, Bernadine Winter became president and Osendorf became executive vice-president. Douglas C. Winter, the son of C.P. and Bernadine Winter, became vice-president and was also elected to the bank's board of directors. Douglas Winter, who had been a loan officer at the bank, apparently assumed the principal responsibility for managing the bank. Bernadine Winter handled personnel matters and teller duties. Osendorf spent little time on bank affairs and continued to manage the insurance agency.

In March 1984 Osendorf obtained director's and officer's (D & O) liability insurance for the bank from St. Paul. The policy provided coverage through July 1, 1986. In March 1985 St. Paul decided to add several new endorsements, including a regulatory exclusion, to all of its bank D & O liability policies. St. Paul also increased premiums and shifted from multiple-year to annual policy periods. In August 1985 St.

---

1. The Honorable Donald D. Alsop, Chief Judge, United States District Court for the District of Minnesota.

Paul filed the exclusions with Minnesota authorities. The exclusions significantly reduced the coverage provided by St. Paul's D & O liability policies. St. Paul established internal procedures to notify its insured banks of these changes in coverage. St. Paul instructed its agents to quote all new and renewal D & O business with the stipulation that the exclusions would be attached to the D & O liability policies as soon as St. Paul received regulatory approval and to obtain written acknowledgement of the policy changes.

On May 5, 1986, St. Paul sent Osendorf an application to renew the bank's D & O liability policy. The renewal letter stated that St. Paul had decided to add several exclusions, explained the effects of the exclusions on coverage [2] and noted that the exclusions would be added at renewal. Douglas Winter and Bernadine Winter completed and executed the renewal application and returned it to St. Paul. St. Paul then sent the bank a letter quoting a much higher premium for D & O coverage for one year and a higher deductible. The quote letter did not include any information about the exclusions or seek written acknowledgement of the exclusions by the bank. The bank accepted the new premium and St. Paul issued the bank a new D & O liability policy, which included the regulatory and insured v. insured exclusions, for coverage as of July 1, 1986.

St. Paul sent two copies of the renewal policy to Osendorf, one copy for the insurance agency and the other copy for the bank. The policy contained a typed page stating that liability was subject to several new endorsements and listed the endorsements. The regulatory exclusion was one of the listed endorsements. Another page of the policy entitled "Notice" stated that the policy contained one or more of the new endorsements and briefly described each

endorsement, including the regulatory exclusion. Subsequent pages of the policy set forth the new endorsements in full, including the regulatory exclusion, which provided:

> In consideration of the premium charged, it is agreed that there is no coverage for any claims made against the Directors or Officers of the [bank] based upon or attributable to any claim, action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation, Federal Savings and Loan Insurance Corporation, any other similar depository insurance organization, or by any other Federal or State Regulatory Agency; whether such claim, action or proceeding is brought in the name of such Regulatory Agency or by or on behalf of such Regulatory Agency in the name of any other entity.

The 1986 D & O liability policy was renewed in 1987 and provided D & O coverage through June 30, 1988.

In the meantime, in 1986, Douglas Winter began to trade in large denomination government bonds on behalf of the bank. He did not properly record most of these transactions and did not maintain complete records on the bonds. He mistakenly believed that his trading activities through 1986 had generated a profit for the bank of $50,000.00 to $60,000.00. In March 1987 Minnesota banking authorities examined the bank. In May 1987 the bank's outside auditor began the yearly director's audit. The outside auditor discovered balance sheet problems and traced them to the bank's margin account, the account which Douglas Winter had used for his trading. The auditor requested trading confirmations from various securities brokers. By July 1987, the auditor had enough information to conclude that the bank had serious

---

**2.** The May 1986 renewal letter explained that [t]he regulatory exclusion rider excludes from coverage claims made against directors and officers based on or attributed to any claim, action or proceeding brought by or on behalf of any depository insurance organization (FDIC, FSLIC, etc.) or any other federal or state regulatory agency. The Insured v. Insured rider excludes from coverage claims

made against the Insured(s) by any other insured(s) as defined in the policy except for derivative action brought by shareholder(s) when such shareholder(s) is not a director or officer.
*St. Paul Fire & Marine Ins. Co. v. FDIC,* 765 F.Supp. 538, 541 (D.Minn.1991) (quoting text of renewal letter).

financial problems and notified the state banking authorities.

In August 1987 the FDIC began its examination of the bank. The FDIC examination was not completed because in October 1987 the state banking commissioner determined the bank was insolvent and ordered the bank closed. The FDIC was appointed as receiver. The FDIC made a claim against the bank's officers and directors to recover the $4.5 million in losses suffered by the bank. St. Paul denied the claim on the ground that coverage was excluded by the restrictive endorsements in the D & O liability policy issued to the bank. In May 1989, anticipating litigation, St. Paul filed this action against the FDIC in federal district court seeking a declaratory judgment that it had no obligation to insure either the bank or its former directors and officers against claims asserted by the FDIC.

In August 1989, as St. Paul had anticipated, the FDIC filed a third-party action against the bank's former directors and officers, seeking damages of $4.5 million for losses suffered by the bank as a result of improper securities trading, breaches of fiduciary, statutory and common law duties, and breach of contract. In March 1991 the FDIC and the bank's former directors and officers settled the third-party action. Pursuant to a stipulation, the third-party defendants confessed judgment in the amount of $4,481,123.71 in return for the FDIC's agreement that its recovery, if any, would come only from the proceeds of any applicable insurance policies, primarily the $1 million D & O liability policy issued to the bank by St. Paul.

In the meantime, St. Paul and the FDIC filed cross-motions for summary judgment in the declaratory judgment action. St. Paul argued that the regulatory endorsement in the D & O liability policy issued to the bank excluded coverage for claims against the bank's former directors and officers asserted by the FDIC. The FDIC argued that the D & O liability policy covered the losses caused by the bank's for-

mer directors and officers. The FDIC argued that St. Paul could not rely on the regulatory exclusion because it had failed as a matter of law to provide adequate notice to the bank of the reduction in coverage. The FDIC also argued that the regulatory endorsement was ambiguous and contrary to public policy and violated the reasonable expectations of the bank and its former directors and officers about the scope of coverage.

The district court found that the May 1986 renewal letter, in conjunction with the notice contained in the policy itself, was sufficiently conspicuous to satisfy the notice requirement. 765 F.Supp. at 544, *citing Canadian Universal Insurance Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 575 (Minn.1977). The district court also found that Osendorf was an agent of the bank, Bernadine Winter and Douglas Winter for purposes of obtaining D & O liability insurance and accepting notice about changes in coverage. 765 F.Supp. at 546. The district court also concluded that the regulatory exclusion was not ambiguous and did not violate public policy or the reasonable expectations of the bank or its former directors and officers about the scope of coverage. *Id.* at 548–51.[3] The district court granted summary judgment in favor of St. Paul, and this appeal followed.

STANDARD OF REVIEW

We review a grant of summary judgment de novo, without deferring to the decision of the district court. The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). We must also review district

---

**3.** The district court also found that the insured v. insured exclusion was ambiguous. 765 F.Supp. at 548. However, St. Paul did not cross-appeal.

court determinations of state law de novo. *See Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

## ADEQUACY OF NOTICE

The FDIC first argues the district court erred in granting summary judgment in favor of St. Paul because there are disputed issues of material fact with respect to the adequacy of the notice received by the bank about the regulatory exclusion and resultant reduction in coverage. The FDIC argues that neither the May 1986 renewal letter nor the renewal policy itself provided clear or conspicuous notice of the reduction in coverage as required by Minnesota law. The FDIC notes that the May 1986 renewal letter did not comply with St. Paul's internal notification guidelines and that the pages of the renewal policy sent to Osendorf were not in the correct order.

As recognized by the district court, under Minnesota law, "when an insurer reduces the prior insurance coverage provided the insured, the insurer has an affirmative duty to notify the insured in writing of the change in coverage. Failure to do so shall render the purported reduction in coverage void." *Canadian Universal Insurance Co. v. Fire Watch, Inc.,* 258 N.W.2d at 575. The insurer "has an obligation to inform the insured, by cover letter or a conspicuous heading to the amendatory endorsement, or some similar means, that the endorsement contains significant changes in coverage, and offer to explain and discuss the significance of the changes to the insured upon request." *Id., citing Allstate Insurance Co. v. Reeves,* 66 Cal.App.3d 464, 469, 136 Cal.Rptr. 159, 162 (1977).

■ We agree with the district court that the May 1986 renewal letter and the renewal policy, considered together, constituted conspicuous notice in writing of the change in coverage as required by Minnesota law. 765 F.Supp. at 544. The May 1986 renewal letter stated in plain language that the insurer had decided to add several endorsements to the renewal policy

and explained the effect of the regulatory exclusion. In addition, the renewal policy contained several pages which expressly referred to the changes in coverage, including a half-sheet discussing changes in coverage, a second sheet that contained a typed notice of the regulatory exclusion and other endorsements, and another page entitled "Notice" that explained that the policy differed from the previous policy and contained a regulatory exclusion that eliminated coverage for suits brought by or on behalf of the FDIC.

The FDIC further argues that notice to Osendorf was not adequate notice to the other insureds, that is, to the bank, Bernadine Winter and Douglas Winter. The FDIC argues that although Osendorf was an officer and director of the bank, Osendorf had no actual or apparent authority to act as their agent to accept notice about changes in coverage or to obtain less than comprehensive D & O liability coverage. The FDIC also argues that Osendorf was a dual agent for St. Paul and for the bank and that notice about the changes in coverage was sent to Osendorf in his capacity as an agent for St. Paul only and not as an agent for the bank.

■ The scope of Osendorf's authority is a question of state agency law. As recognized by the district court, under Minnesota law, "[a]gency is defined ... as ... 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his [or her] behalf and subject to his [or her] control, and consent by the other so to act.'" *Jurek v. Thompson,* 308 Minn. 191, 197, 241 N.W.2d 788, 791 (Minn.1976), *citing* Restatement (Second) of Agency § 1 (1958). In general, an agent's actual notice or knowledge may be imputed to the agent's principal. *See, e.g., Centennial Insurance Co. v. Zylberberg,* 422 N.W.2d 18, 21 (Minn.Ct.App.1988). The same is true of a corporate officer acting within the scope of his or her duty—the corporate officer's knowledge may be imputed to the corporation. *See, e.g., Brooks Upholstering Co. v.*

*Aetna Insurance Co.*, 276 Minn. 257, 262, 149 N.W.2d 502, 506 (1967). Under Minnesota law, dual agency is permissible with the consent of both principals. *See, e.g., Nelson v. American Reliable Insurance Co.*, 286 Minn. 21, 174 N.W.2d 126, 129–30 (1970).

■ We agree with the district court that no genuine issue of material fact exists as to Osendorf's authority to act as an agent for the bank and the other insureds, including the authority to accept notice of changes in the scope of D & O liability insurance coverage. 765 F.Supp. at 546–47. Bernadine Winter and Douglas Winter each testified in depositions that Osendorf had full responsibility for handling all of the insurance matters for the bank, including D & O liability insurance. Osendorf was also listed on the renewal application as authorized to receive notices. In addition, the bank and St. Paul knew of and did not object to Osendorf's dual status as an insurance representative for St. Paul and other insurers and as an officer and director of the bank with the authority to act on behalf of the bank in insurance matters.

## AMBIGUITY

The FDIC next argues the district court erred in holding the regulatory exclusion is not ambiguous. The FDIC argues the regulatory exclusion is ambiguous and should be construed strictly against St. Paul because it is reasonably susceptible of two alternative constructions, neither of which bars coverage for the FDIC's claim, as receiver for the bank, against the bank's former directors and officers. The FDIC argues the regulatory exclusion could be construed to bar coverage only for secondary actions. Secondary actions are actions brought by a third-party against an insured following an initial action brought by the FDIC. For example, when the FDIC sues a bank's accountant and the accountant then sues the bank for contribution or indemnity, the claim asserted by the accountant against the bank is considered a secondary action which would be excluded from coverage under the bank's D & O liability policy as a claim "based upon or attributable to" the action brought by the FDIC against the accountant. In the alternative, the FDIC argues the regulatory exclusion could be construed to bar coverage only for direct actions brought by the FDIC against the bank's former directors and officers for statutory and regulatory violations, that is, for sanctions such as civil penalties. The FDIC argues that this alternative construction is consistent with its dual capacity as both a regulator and a receiver and should not bar claims brought by it as a receiver against the bank's former directors and officers.

■ As recognized by the district court, under Minnesota law, ambiguity in an insurance policy is a question of law to be decided by the court. *See, e.g., Columbia Heights Motors, Inc. v. Allstate Insurance Co.*, 275 N.W.2d 32, 34 (Minn.1979). "In interpreting a policy exclusion, any ambiguity in the language of the policy must be construed in favor of the insured. The court, however, has no right to read an ambiguity into the plain language of an insurance contract in order to construe it against the insurer." *Henning Nelson Construction Co. v. Fireman's Fund American Life Insurance Co.*, 383 N.W.2d 645, 652 (Minn.1986) (citations omitted). We agree with the district court that the regulatory exclusion is not ambiguous. 765 F.Supp. at 549. The plain language of the regulatory exclusion bars coverage for any claim against the directors and officers of the bank based on any action or proceeding brought by or on behalf of the FDIC. When read as a whole, the regulatory exclusion covers any claim, direct or secondary, brought against the directors and officers of the bank by the FDIC in any capacity. *See American Casualty Co. v. FDIC*, 944 F.2d 455, 460 (8th Cir.1991); *cf. FSLIC v. Shelton*, 789 F.Supp. 1355, 1357 (M.D.La. 1992) (holding phrase "based upon or attributable to" is not ambiguous and rejecting secondary suit construction); *FDIC v. Zaborac*, 773 F.Supp. 137, 141–42 (C.D.Ill. 1991) (holding similar regulatory exclusion is not ambiguous and rejecting secondary suit construction); *American Casualty Co. v. Baker*, 758 F.Supp. 1340, 1348 (C.D.Cal. 1991) (same); *Gary v. American Casualty*

*Co.*, 753 F.Supp. 1547, 1550 (W.D.Okla. 1990) (same).

## PUBLIC POLICY

The FDIC finally argues the district court erred in holding the regulatory exclusion did not violate public policy. The FDIC argues the district court's construction of the regulatory exclusion to deny D & O liability insurance coverage for claims asserted by the FDIC directly as a receiver is inconsistent with the broad powers granted to the FDIC in the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989) (*codified at* 12 U.S.C. §§ 1811–1833), as a receiver of failed financial institutions, including the right to bring D & O liability claims.

■ Like other questions of contract interpretation, whether the regulatory exclusion violates public policy is a question of law which we review de novo. *See FDIC v. Aetna Casualty & Surety Co.*, 903 F.2d 1073, 1077 (6th Cir.1990). "It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated." *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945).

The power to refuse to enforce contracts on the ground of public policy is therefore limited to occasions where the contract would violate "some explicit public policy" that is "well defined and dominant, and [which] is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interest.'" *St. Paul Mercury Insurance Co. v. Duke University*, 849 F.2d 133, 135 (4th Cir.1988) (internal citations omitted).

■ We agree with the district court that FIRREA does not establish an explicit public policy that would invalidate the regulatory exclusion. 765 F.Supp. at 550. The FDIC's public policy argument is undermined by FIRREA and its legislative history. FIRREA originally included a provision that the FDIC could require contracts, including D & O liability policies, to remain in effect even if the contract contained a provision terminating the contract upon the appointment of the FDIC as a conservator or receiver. The bill's managers, however, deleted this provision because insurers had determined premiums based on the exclusion and invalidation of the exclusion would have increased insurers' risk exposure retroactively. 135 Cong. Rec. S4278 (daily ed. Apr. 19, 1989) (statement of Sen. Riegle). As enacted, FIRREA contains an exception for D & O liability policies:

> [t]he conservator or receiver may enforce any contract, *other than a director's and officer's liability insurance contract* . . ., entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver.

12 U.S.C. § 1821(e)(12)(A) (emphasis added). In light of this express statutory provision exempting enforcement of D & O liability policies by a conservator or receiver, we cannot see how enforcement of the regulatory exclusion would violate public policy. We rejected similar public policy arguments in *American Casualty Co. v. FDIC*, 944 F.2d at 460.

■ Finally, the FDIC argues enforcement of the regulatory exclusion frustrates the "reasonable expectations" of the insured about the scope of coverage. The FDIC argues that the regulatory exclusion is in effect a "hidden major exclusion" which must be strictly construed against the insurer and in favor of coverage. *See, e.g., Hubred v. Control Data Corp.*, 442 N.W.2d 308, 311 (Minn.1989); *Atwater Creamery Co. v. Western National Mutual Insurance Co.*, 366 N.W.2d 271, 278 (Minn.1985). The district court decided that the reasonable expectations doctrine was not applicable. 765 F.Supp. at 551. We agree with the district court. As noted by the district court, "Minnesota courts have consistently restricted application of the doctrine to exceptional cases where a policy provision is both a 'hidden major exclusion' and unconscionable as a result of

unequal bargaining power where the insured may have been misled." *Id.* (citations omitted). In the present case, the regulatory exclusion was not hidden in the policy. As discussed above, the terms of the regulatory exclusion were plain and unambiguous. Moreover, as noted by the district court, this is not a case which involves disparity in bargaining power; the insured parties were a bank and its senior management, one of whom was a licensed insurance agent. *Id., citing Empire State Bank v. St. Paul Fire & Marine Insurance Co.*, 441 N.W.2d 811, 814 (Minn.Ct. App.1989) (refusing to apply reasonable expectations doctrine to a bank).

In sum, we adopt the well-reasoned analysis of the district court and, accordingly, affirm the order of the district court granting summary judgment in favor of St. Paul.