GLEN NELSON, d. b. a. NELSON'S SUPER
MARKET, AND OTHERS v. AMERICAN
RELIABLE INSURANCE COMPANY
AND ANOTHER.

174 N. W. (2d) 126.

January 16, 1970—No. 41766.

22

*Plunkett & Plunkett,* for appellants.

*Kenneth K. McMillan,* for respondent Nelson.

*Robins, Davis & Lyons* and *Lawrence Zelle,* for respondent insurance companies.

Heard before Knutson, C. J., and Nelson, Sheran, Peterson, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

Defendants appeal from a declaratory judgment holding four insurance companies liable for the loss sustained by plaintiff Glen Nelson as a result of business interruption caused by a fire which substantially destroyed his supermarket. The judgment also awarded Nelson attorneys' fees against the insurance companies. The plaintiff insurance companies also sought review of the judgment and of an order denying their motion for a new trial. The plaintiff companies claim that their policies were not in effect on January 6, 1967, the date of the fire, and defendant American Reliance Insurance Company maintains that its policies had been canceled.

This case involves a complicated series of transactions between two insurance agents and the insurance companies. In 1962 Michael Nilan, a general insurance agent, suggested that plaintiff Glen Nelson obtain business-interruption insurance for Nel-

son's Super Market in Austin. In October 1962 Nelson asked Nilan to obtain $50,000 of business-interruption insurance for the supermarket. Nelson expressed no preference for any insurance company but, rather, left the choice of companies entirely to Nilan. Nilan procured two $25,000 policies, and by November 1966 these two policies were assumed by defendant American Reliable Insurance Company (hereinafter called American).[1] American wrote Nilan on November 29, 1966, asking him to return one of these policies for cancellation.

Nilan assumed that American was unaware of the other policy and would want to cancel it also; so, on December 6 or 7, 1966, Nilan asked Robert Jacobson, a local agent in Austin for a number of insurance companies, to obtain $50,000 in business-interruption insurance for Nelson's Super Market. (In the insurance business this arrangement is termed brokering. Nilan asked Jacobson to broker the insurance.)

On December 14, 1966, agents for plaintiffs Integrity Mutual Insurance Company (hereinafter called Integrity) and Iowa Kemper Insurance Company (hereinafter called Iowa Kemper) made a routine call at Jacobson's office. The agents inspected Nelson's Super Market, and the Iowa Kemper agent agreed to take a $15,000 policy. The Integrity agent called Jacobson the next morning, December 15 (which becomes an important date), and agreed to accept $25,000. On December 16, 1966, an agent for Iowa Mutual Insurance Company (hereinafter called Iowa Mutual) told Jacobson his company would accept a $10,000 policy.

On December 15 Nilan asked Jacobson what progress he had made in brokering the insurance. Jacobson told him that Integrity was taking $25,000 and that he was attempting to place the remaining $25,000 with two companies.

---

[1] One of these policies was issued by defendant Underwriters Insurance Company, which apparently is the reason that insurer was made a party.

On December 15 Nilan wrote American, informing it of the second $25,000 policy and stating that he could broker the insurance although he would prefer that American retain it. American had also written Nilan on December 15, asking if it should send a cancellation notice to the insured, Nelson. This apparently was a way American took to impress upon Nilan its desire to cancel its policies, inasmuch as it appears that insurance companies, to avoid injuring the business relationship between the agent and the insured, usually send cancellation notices only as a last resort. On December 20 American replied to Nilan's letter, saying that it would appreciate his rewriting the policies at an early date and returning the American policies for cancellation.

On December 15 Jacobson sent applications to Integrity and Iowa Kemper for the policies they had authorized. He sent an application to Iowa Mutual shortly thereafter. He considered that these applications bound the companies. All of the policies were to be effective December 15, 1966, for a 3-year term.

By December 26, 1966, Jacobson had received the three policies—Integrity's for $25,000, Iowa Kemper's for $15,000, and Iowa Mutual's for $10,000. Iowa Mutual had not ascertained the premium for its policy. Therefore it was issued "subject to rate," and Iowa Mutual was to determine its rate at a later time.

Jacobson did not tell Nilan he had received these policies. They had no conversation about the insurance between December 15, 1966, and January 7, 1967, the day after fire destroyed Nelson's supermarket. Nilan had not asked Jacobson about the insurance during this period since Jacobson was "doing [him] a big favor" and Nilan did not want to press him.

Nilan telephoned Jacobson on January 7, 1967, at which time Jacobson said he had the policies and gave Nilan the policy numbers. Jacobson explained that he had not given Nilan the policies because he was waiting for Iowa Mutual to determine its rate. Jacobson did not deliver the policies to Nilan until February 22, 1967, because an adjuster had requested him not to deliver them.

Iowa Kemper and Integrity billed Jacobson for their policies

around January 10 to 15. Jacobson presented their bills to Nilan on February 22, 1967, and Nilan paid them on February 28, 1967. The companies retained the premiums.

Nilan returned the American policies to that company February 28. This delay was the result of Nelson's absence from Austin for a period. American then canceled the policies on its books and sent Nilan a credit memo for a pro rata refund of the premiums as of December 15, 1966.

Nilan did not tell Nelson anything about either American's desire to cancel the two policies or Nilan's efforts to broker the insurance through Jacobson. Nilan handled the bulk of Nelson's insurance at this time and had been insuring Nelson for at least 10 years. Nelson had considerable respect for Nilan's insurance advice and kept the policies Nilan sold him in Nilan's office. Supermarket insurance was difficult to maintain since it was risky, and companies would often seek to cancel their policies. Often, when a company sought to cancel, Nilan would arrange for replacement insurance without consulting Nelson. Nelson did not care what companies insured him, and, in fact, at the time of the fire he did not know with which company he had the insurance. Nilan would pay the premiums to the companies, and Nelson would write Nilan a check each month to cover the estimated total insurance cost for all policies. The actual cost would be determined at the end of the year. Thus Nelson left the original placement of the insurance and any replacement caused by cancellation entirely to Nilan's discretion.

■ Previous decisions have held that an insurance agent had authority to replace policies under circumstances similar to those present in the instant case. In Hamm Realty Co. v. New Hampshire Fire Ins. Co. 80 Minn. 139, 83 N. W. 41, the evidence established that the plaintiff allowed his insurance agency to designate the insurance companies and never objected when the agency substituted policies, thereby justifying the conclusion that the agent had authority to replace the policy in question without consulting the insured. In reversing the trial court's dis-

missal, this court said that defendant's policy could have been substituted by the insurance agent for a policy another company had asked to have canceled without notice to the insured.

The facts in the Hamm Realty case are the same as those here except that in Hamm the agent directed that the policy be canceled and wrote the new insurance himself. It should make no difference here that Jacobson, rather than Nilan, arranged for the new policies. Nilan delegated to Jacobson authority to procure the policies.

In Sterling Fire Ins. Co. v. Comision Reguladora Del Mercado De Henequen, 195 Ind. 29, 143 N. E. 2, the insured asked Gregory and Appel, insurance agents, to keep a quantity of sisal insured and to broker this insurance. The insured gave no instructions to place the insurance with any particular company. Gregory and Appel then arranged with another insurance agency, O. J. Smith Company, to maintain the policies. It was customary for O. J. Smith Company to replace the policies when they were canceled, without notice to either Gregory and Appel or the insured. Upon a request by a company to cancel, O. J. Smith Company accepted the cancellation and rewrote the policy. In affirming the trial court, the Indiana Supreme Court held the substitution was within the agent's authority, and therefore was valid.

Many of these substitution cases were decided 50 to 70 years ago and are collected in Annotation, 83 A. L. R. 298. More recent cases include Firemen's Ins. Co. v. Simmons, 180 Ark. 500, 22 S. W. (2d) 45; Insurance Underwriters' Agency v. Pride, 173 Ark. 1016, 294 S. W. 19; N. Pelaggi & Co. v. Orient Ins. Co. 102 Vt. 384, 148 A. 869; Hoover v. Millers Nat. Ins. Co. 17 Wash. (2d) 407, 135 P. (2d) 846. No problem is raised by the agent's dual role. He may be the agent of the insured as well as of the insurance company where he is given the authority and where he does not sacrifice the insured's interest. See, for example, N. Pelaggi & Co. v. Orient Ins. Co. *supra*.

In view of the above holdings and the evidence presented in this case, we conclude that Nilan had authority to replace

Nelson's policies without consulting Nelson, and Nilan delegated this authority to Jacobson. We must now decide whether Nilan and Jacobson exercised this authority and replaced the policies.

■ Plaintiffs claim that Jacobson's failure to countersign the policies until he delivered them to Nilan on February 22, 1967, is fatal to their validity. Jacobson did not countersign the policies since he was waiting for Iowa Mutual to determine its rate. This countersignature was necessary under the Minnesota standard fire insurance policy, Minn. St. 65A.01, subd. 3. However, as we said in the Hamm Realty case, the countersignature is not required if it was the intention of the parties to accept the policy. Here the insurance companies intended to be bound, and Jacobson intended them to be bound. Thus the policies are valid even in the absence of the countersignature. Jacobson did not have to deliver the policies to anyone to validate them, since he had authority to accept the policies.

■ We must next decide if the acceptance of the new policies canceled the old policies. In the substitution cases cited above, the agent actually canceled the old policy after he got the new policy. In the present case Nilan did not cancel the old policies since he did not know that Jacobson had received the new policies. However, from the testimony presented we may conclude that if Jacobson had given Nilan the new policies, Nilan would have canceled the American policies at once. All parties—the insurance companies and both agents—intended that American's policies be canceled as soon as the new policies were issued. Therefore, we hold that as a matter of law the issuance of the new policies canceled the American policies. This is justified in view of the fact that Jacobson, the Integrity-Iowa companies' agent, caused the delay in delivery to Nilan and in view of the common practice in the insurance industry of canceling the old policy retroactive to the issuance of the new policy. We fail to see why the retroactive cancellation procedure should be any different when a loss has occurred than when there has been no loss.

28

Plaintiffs, in support of their contention, have relied on a number of insurance cases which can be distinguished from the case at hand. For example, in Merchants & Farmers Mutual Cas. Co. v. St. Paul-Mercury Ind. Co. 214 Minn. 544, 8 N. W. (2d) 827, this court failed to find that the old insurance policy had been canceled as a matter of law when the new policy was issued. There, not only did the agent not have authority to substitute policies, but he did not arrange for the new policy. In addition, there was a dispute between the insured and the agent for the old company as to the amount of the premium refund. This court said it was a question for the jury whether the insured intended to cancel before the refund was given. We later affirmed a jury verdict implicitly finding that there was no cancellation. Merchants & Farmers Mutual Cas. Co. v. St. Paul-Mercury Ind. Co. 218 Minn. 386, 16 N. W. (2d) 463.

Plaintiffs also rely on National Surety Corp. v. Brunswick Corp. (5 Cir.) 391 F. (2d) 26. The facts in that case are about as different from those of the case at hand as they could be. In National Surety Corp. the insured objected to the insurer's desire to cancel. The insured had given the agent no authority to cancel or substitute policies. The insured objected to the terms in the proposed substitute policy and had not accepted it at the time of the loss. For those reasons the court held the old company liable and the new company not liable.

Plaintiffs' reliance on Glens Falls Ins. Co. v. Founders' Ins. Co. 209 Cal. App. (2d) 157, 25 Cal. Rptr. 753, is also misplaced. There the original insurer did not want to cancel. The insured had threatened to cancel but had never unequivocally and unconditionally requested a cancellation. Thus, in Glens Falls there was neither an unconditional request nor mutual consent to cancel. However, in the present case American had asked Nilan to cancel, but, following insurance custom, American allowed him to rewrite the policies before canceling. There was also mutual consent of the insurer and of the agent on behalf of the insured

that the policies would be canceled as soon as the new policies were written.

Based on the foregoing we find that Iowa Kemper, Iowa Mutual, and Integrity are liable for provable loss to the insured to the full extent of their policies. American is relieved of any liability.

■ The trial court erred in allowing plaintiff Nelson to recover attorneys' fees from the insurance companies. In the absence of statutory authorization or of a policy provision awarding attorneys' fees, they are not recoverable. An exception to this general rule is the case where an insurance company fails to defend against a third party. In such a case the insured may, in a subsequent action against the insurer, recover attorneys' fees incurred in the third-party action. Rent-A-Scooter, Inc. v. Universal Underwriters Ins. Co. 285 Minn. 264, 173 N. W. (2d) 9; 7A Appelman, Insurance Law and Practice, § 4691. There was no such third party in this case; only the insurance companies and the insured were involved.

The judgment is affirmed in part and reversed in part.