ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,
Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE
COMPANY, as receiver of the State
Bank of Greenwald, Minnesota, Defendant and Third–Party Plaintiff,

v.

Douglas A. WINTER, Bernadine Winter
and Robert J. Osendorf, Third–Party
Defendants.

No. 3–89 CIV 326.

United States District Court,
D. Minnesota,
Third Division.

May 20, 1991.

Faegre & Benson by Mark D. Savin and Norman R. Carpenter, Minneapolis, Minn., for plaintiff.

Dorsey & Whitney by Brian E. Palmer and Michael Lindsay, Minneapolis, Minn., for defendant and third-party plaintiff.

ORDER

ALSOP, Chief Judge.

This matter came before the court on February 1, 1991, on cross-motions for summary judgment by St. Paul Fire and Marine Insurance Company ("St. Paul") and the Federal Deposit Insurance Corporation ("FDIC") pursuant to Federal Rule of Civil Procedure 56(b).

## I. STANDARD OF REVIEW

The Supreme Court has held that summary judgment is to be used as a tool to isolate and dispose of claims or defenses which are either factually unsupported or which are based on undisputed facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Hegg v. United States*, 817 F.2d 1328, 1331 (8th Cir.1987). Summary judgment is proper, however, only if examination of the evidence in a light most favorable to the non-moving party reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The test for whether there is a genuine issue over a material fact is two-fold. First, the materiality of a fact is determined from the substantive law governing the claim. Only disputes over facts that might affect the outcome of the suit are relevant on summary judgment. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512; *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987). Second, any dispute over material fact must be "genuine." A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. It is the non-moving party's burden to demonstrate that there is evidence to support each essential element of his claim. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## II. FACTUAL BACKGROUND

On May 19, 1989, St. Paul commenced an action (the "coverage action") against the FDIC. St. Paul seeks the determination that it has no obligation to insure either the former State Bank of Greenwald, Minnesota ("Bank") or the Bank's former directors and officers, Douglas A. Winter, Bernadine Winter, and Robert J. Osendorf (collectively, the "Third–Party Defendants"). St.

Paul initiated the coverage action in anticipation of the FDIC's commencement of litigation against the Third–Party Defendants.

On August 2, 1989, the FDIC commenced a third-party action (the "D & O action") against the Third–Party Defendants. The FDIC did so in order to consolidate all claims related to the Third–Party Defendants' conduct in the same proceeding. In the D & O action, the FDIC seeks damages for over $4 million in losses suffered by the Bank as a result of improper securities trading, breaches of fiduciary, statutory, and common law duties, and breach of contract.

This matter is before the court on cross-motions for summary judgment in the coverage action. Both the FDIC, the Third–Party Defendants,[1] and St. Paul have asked the court to determine coverage issues as a matter of law.

The Bank was established in 1910 under the laws of the State of Minnesota and was insured by the FDIC under the Federal Deposit Insurance Act of 1933. In 1965, Clarence ("C.P.") Winter, a long-time officer, and Lyle Olmscheid acquired the Bank. In 1972 it appears C.P. Winter bought out Olmscheid's interest in the Bank. Later, in 1978, a bank holding company was formed, Greenwald Bankshares, Inc., in which C.P. Winter and his wife, Bernadine Winter, collectively owned 96 percent of the stock. Greenwald Bankshares became owner of 84 percent of the stock in the Bank, and at the time the Bank closed, the stock in Greenwald Bankshares was owned by Bernadine Winter and C.P. Winter's estate. The Winters also acquired the Greenwald State Agency, an insurance agency located at the Bank operated by Robert J. Osendorf. At the time the Bank closed, Bernadine Winter was sole owner of the Agency stock.

C.P. Winter was president of the Bank, and at the time of his death in 1983 the board of directors at the Bank consisted of himself, Osendorf, and Bernadine Winter,

---

**1.** The Third–Party Defendants themselves did not move for summary judgment. Rather, they filed a response to St. Paul's motion in which they noted they agree with and adopt by reference FDIC's arguments as to the coverage issues. Thus, the Third–Party Defendants' brief is limited to a discussion of the reasonable expectations doctrine.

who also held the offices respectively of president, vice president, and executive vice president. Osendorf also managed the Bank's insurance business, the Greenwald State Agency, and was an agent for St. Paul. Following C.P. Winter's death, his son, Douglas Winter, was elected to the Bank's board of directors. Prior to that time, Douglas had been working as a loan officer at the Bank following his completion in 1980 of a two-year vocational program. Effective in November of 1983, Bernadine Winter became the Bank's president and Douglas its vice president; Osendorf became the Bank's executive vice president and continued to manage the insurance agency. Bernadine Winter, however, largely confined herself to personnel matters and teller duties, and Osendorf spent virtually no time on the Bank's affairs. Even though he was executive vice president, Osendorf's principal activity was the Greenwald State Agency, which represented several carriers, including the St. Paul Fire and Marine Insurance Company.

### A. *The Bank's Insurance Coverage*

Osendorf advised the board on March 15, 1984 that he had submitted an application to St. Paul for directors and officers' liability insurance and received a quote of $3,500.00 for a three-year policy. The Bank applied for the policy, and D & O policy number 400 GM 8971 was issued to the Bank on March 28, 1984. However, the policy was written for coverage only to July 1, 1986, to coincide with the renewal date of the Bank's St. Paul blanket bond.

On May 5, 1986, prior to the expiration date of the D & O policy, Christine Leudesdorf of the St. Paul's Upper Midwest Service Center sent Osendorf applications to renew the D & O policy and the bond. That letter explained that:

> The St. Paul has filed for approval in all states for the use of three amendatory endorsements referred to as the regulatory exclusion rider, the insured v. insured rider, and the punitive damage interpretive endorsement. The regulatory exclusion rider excludes from coverage claims made against directors and officers based on or attributed to any claim, action or proceeding brought by or on behalf of any depository insurance organization (FDIC, FSLIC, etc.) or any other federal or state regulatory agency. The Insured v. Insured rider excludes from coverage claims made against the Insured(s) by any other insured(s) as defined in the policy except for derivative action brought by shareholder(s) when such shareholder(s) is not a director or officer.... These endorsements will be added at renewal.

The applications were completed and executed by Douglas Winter and Bernadine Winter on May 16, and returned to the St. Paul. The St. Paul quoted a new premium for D & O coverage, $7,000 annually, which was accepted by the Bank and a new D & O policy number 400 HG 6741, with the additional endorsements was issued as of July 1, 1986. These endorsements lie at the heart of the FDIC's and St. Paul's pending summary judgment motions. The first, entitled the "regulatory exclusion," provides as follows:

> In consideration of the premium charged, it is agreed that there is no coverage for any claims made against the Directors or Officers of the [Bank] based upon or attributable to any claim, action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation, Federal Savings and Loan Insurance Corporation, any other similar depository insurance organization, or by any other Federal or State Regulatory Agency; whether such claim, action or proceeding is brought in the name of such Regulatory Agency or by or on behalf of such Regulatory Agency in the name of any other entity.

The second endorsement at issue, entitled the "Insured v. Insured exclusion," provides as follows:

> In consideration of the premium charged, it is agreed that the Company shall not be liable to make any payment for loss in connection with any claim or claims made against the Insured(s) by any other Insured(s) as defined in this Policy, except for shareholder's derivative actions brought by a shareholder(s) of the In-

sured corporation(s) as defined in insuring agreement IIB1 when such shareholder(s) is not a director or officer of such Insured corporation(s) at the time the derivative action is filed.

Two copies of this policy were delivered to Osendorf, one for the agency and one for the Bank. Opening the policy, on the page where Osendorf was to countersign, there was a typed statement that:

The liability of the company is subject to the terms of the following endorsements attached hereto: ...

No. 6 Regulatory Exclusion

No. 7 Insured v. Insured exclusion ...

Directly after this page was a page entitled "Notice" that stated:

This policy may differ in form from the one you previously had. We urge you to discuss and compare coverage with your insurance agent.

This policy contains one or more of the endorsements listed below. A brief description of each follows.

1. *Insured v. Insured Exclusion.* This endorsement eliminates coverage for suits brought by one insured against another insured.

2. *Regulatory Exclusion Endorsement.* This endorsement eliminates coverage for suits brought by or on behalf of the Federal Deposit Insurance Corporation, Federal Savings and Loan Insurance Corporation, any other similar depository insurance organization, or by any other federal or state regulatory agency.

\* \* \* \* \* \*

These changes may not be the only changes which have been made. Please review your policy carefully.

The pages after the "Notice" set forth each endorsement in full. The 1986 policy was later renewed in 1987 for the period of July 1, 1987 through June 30, 1988.

B. *The Bank's Trading Losses*

In the fall of 1986, Douglas Winter began to trade in large denomination government bonds. Initially Douglas Winter used Norwest Bank and an additional Minne-apolis broker for the Bank's investments. By the fall of 1986, however, he was placing investments through out-of-state brokers. Winter increased the level of his trading activities through the first half of 1987.

Few, if any, of these bond transactions were recorded properly on the Bank's books. At least through the end of 1986, and probably well into 1987, Winter only recorded the net profit or loss after a bond was sold. Winter did not maintain complete records on the bonds held in the Bank's portfolio. Further, those bonds that were on the books were carried at their acquisition value, not their market value. Winter did not learn until June, 1987 of the requirement that trading accounts be "marked to market," i.e., take into account "paper" gains or losses on open positions. Winter believed, based on his incomplete booking of the bond transactions, that his trading activities through the end of 1986 had generated a profit for the Bank of between $50,000 to $60,000.

The State of Minnesota examined the Bank in March, 1987. In addition, on May 27, 1987 Dennis Zaun, the Bank's outside auditor, began his yearly directors' audit. Early in his audit, he discovered balance sheet problems that he traced back to the Bank's margin account. This was one of the accounts used by Winter to record transactions with the many securities brokers with which he was trading. In order to clarify the Bank's accounts, Zaun sent confirmations to the various brokers. By early July, he had received enough responses to determine that the Bank had serious financial problems. Zaun notified Minnesota banking officials of the problems.

The FDIC initiated the last examination of the Bank on August 18, 1987. This examination was never completed, however, because on October 2, the Commissioner of Commerce in and for the State of Minnesota determined that the Bank was insolvent, and pursuant to *Minn.Stat.* § 49.04, ordered the Bank closed, took possession of its business and property, and tendered to the FDIC appointment as receiver of the Bank. The FDIC, pursuant to

section 11(e) of the FDI Act, and subdivision 5 of section 49.05 of the Minnesota Statutes, accepted appointment as receiver of the Bank and since that time has undertaken to administer the Bank's assets and affairs pursuant to the authority granted to it by the FDI Act and Chapter 49 of the Minnesota Statutes.

The FDIC has since made a claim against the officers and directors, Douglas A. Winter, Bernadine Winter, and Robert J. Osendorf for the losses suffered by the Bank. These losses were later found to total approximately $4.5 million. St. Paul was advised of the FDIC claims, but has denied these claims on the grounds that no coverage was available in view of the restrictive endorsements contained in the directors and officers liability policy issued to the Bank. St. Paul then commenced this declaratory judgment action to determine the issues of coverage.

## III. ANALYSIS

In the present suit, St. Paul seeks declaratory judgment that the St. Paul directors and officers liability insurance policy issued to the Bank does not provide indemnity for certain claims made by the FDIC against the failed Bank's directors and officers. The plaintiff seeks declaratory judgment on two grounds: first, that the Regulatory Endorsement and Insured v. Insured Endorsement contained in the policy exclude coverage for the insureds for claims asserted against former officers and directors of the Bank by the FDIC, and second, on the grounds that the policy expired as of July 1, 1987 due to material misrepresentations of fact in the renewal application. The present cross-motions for summary judgment relate solely to the first grounds for declaratory judgment.

The FDIC, in turn, contends that St. Paul's D & O policy covers the losses caused by the Third–Party Defendants' actions and therefore moves for summary judgment on this ground. It asks the court to grant summary judgment for four reasons. First, it claims that under Minnesota law, St. Paul's failure to notify the Bank in writing of its attempted reduction in coverage upon the renewal of the 1984 policy renders both the Regulatory Exclusion and the Insured v. Insured Exclusion void as a matter of law. Second, the FDIC argues that both the Regulatory Exclusion and the Insured v. Insured Exclusion are ambiguous. Third, it maintains that both the Regulatory Exclusion and the Insured v. Insured Exclusion are void as contrary to public policy. Finally, the FDIC contends that the inclusion of the Regulatory Exclusion and the Insured v. Insured Exclusion violates the "reasonable expectations" of the Bank and the Third–Party Defendants as to the scope of coverage afforded by the 1986 policy.

### A. Notice

 Under Minnesota law it is incumbent upon an insurer to "bring to the insured's attention all provisions and conditions that create exceptions or limitations on the coverage." *Campbell v. Insurance Service Agency*, 424 N.W.2d 785, 790 (Minn.Ct.App.1988). The Minnesota Supreme Court in *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 575 (Minn.1977) thus adopted the rule that:

when an insurer reduces the prior insurance coverage provided the insured, the insurer has an affirmative duty to notify the insured in writing of the change in coverage. Failure to do so shall render the purported reduction in coverage void. Any question of the individual's insurance coverage shall then be determined in accordance with the terms of the original policy prior to the renewal or endorsement.

 The *Canadian* court cited with approval a California court's approach to the change in coverage problem. That court held that "fairness requires that when an insurer makes basic coverage changes in insurance afforded a long-time insured, it has an obligation to inform the insured, by cover letter or a conspicuous heading to the amendatory endorsement, or some similar means, that the endorsement contains significant changes in coverage, and offer to explain and discuss the significance of the changes to the insured upon request." *Ca-*

*nadian,* 258 N.W.2d 570, 575 (citing *Allstate Ins. Co. v. Reeves,* 66 Cal.App.3d 464, 469, 136 Cal.Rptr. 159, 162 (1977)).

The FDIC maintains that the form of notice given Osendorf does not comport with the *Canadian* case and therefore the Regulatory and Insured v. Insured Exclusions should be deemed void. In addition, it argues that even if proper notice was given to Osendorf, that notice was not sufficient with regards to the Bank and the other Third–Party Defendants.

The court finds that the notice given to Osendorf as to the changes in coverage under the D & O policy was sufficiently conspicuous to satisfy the requirements of *Canadian.* Along with the renewal application for the D & O policy, which contained the new exclusions, Osendorf received a letter that explained the Regulatory and Insured v. Insured Exclusions would be in force in the renewal policy. In addition, this letter explained in plain language that the Regulatory Endorsement excluded from coverage claims made against directors and officers based on or attributed to any claim, action, or proceeding brought by any depository insurance organization such as the FDIC or FSLIC.

This notice was further supplemented by statements contained in the renewal policy sent to Osendorf. The policy is in booklet form; the cover of the policy is blank with the exception of a title and a window that reveals the first page of the inside of the policy. Opening the policy, the first page is a half-sheet discussing changes in coverage. The bottom half of the second sheet is also visible. This second sheet contains a line where Osendorf was to countersign the policy and the bottom half of the sheet contains a typed notice that the liability of St. Paul is subject to the terms and conditions of endorsements including a Regulatory and an Insured v. Insured Endorsement. This second sheet also notes that these endorsements are attached to the policy. Directly after this page was a page entitled "Notice" that explained that the policy differed from the previous policy, in that it contained an Insured v. Insured Exclusion that eliminated coverage for suits brought by one insured against another insured, and in that it contained a Regulatory Exclusion Endorsement that eliminated coverage for suits brought by or on behalf of the FDIC. Clearly the cover letter sent to Osendorf with the original application, in conjunction with the notice included in the policy, comports with the *Canadian* requirements.

■ The FDIC would next argue that although the letter and policy may have given sufficient notice to Osendorf, notice to Osendorf was not sufficient notice for the other insureds, namely the Bank, Bernadine Winter, and Douglas Winter. The FDIC contends that Osendorf, although an officer and a director of the Bank, had neither actual nor apparent authority unilaterally either to accept notices with respect to or to procure a policy that contained the Regulatory and Insured v. Insured exclusions. Rather, the FDIC maintains that Osendorf's authority was limited to obtaining a comprehensive D & O liability policy.

Under Minnesota law, agency "is defined ... as ... 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Jurek v. Thompson,* 308 Minn. 191, 197, 241 N.W.2d 788 (Minn.1976), quoting Restatement, Agency 2d § 1.

■ As a general matter, an agent's actual notice or knowledge of certain facts may be imputed to such agent's principal. *See, e.g., Centennial Ins. Co. v. Zylberberg,* 422 N.W.2d 18, 21 (Minn.Ct.App. 1988). If a corporate officer is acting within the scope of his or her duty, his or her knowledge is imputable to the corporation. *See, e.g., Brooks Upholstering Co. v. Aetna Ins. Co.,* 276 Minn. 257, 262, 149 N.W.2d 502, 506 (Minn.1967).

The FDIC relies heavily on two recent opinions in a case that raised issues identical to the case at hand: *American Casualty Co. v. Federal Deposit Ins. Corp.,* 713 F.Supp. 311 (N.D.Iowa 1988) [hereinafter referred to as "*American Casualty No. 2* "] and *American Casualty Co. v. Feder-*

al Deposit Ins. Corp., No. C–86–4018, 1990 WL 66505 (N.D.Iowa Feb. 26, 1990) [hereinafter referred to as "American Casualty No. 3"].

In *American Casualty No. 2*, the insurance company asked the court to find, as a matter of law, that one of the officers of the failed bank, Jack Christensen, was the agent of the bank and its directors and officers for the purpose of receiving notice of the D & O policy terms and conditions, including a Regulatory and Insured v. Insured endorsement. Finding a material issue of fact as to the parameters of the agency relationship, the court denied the insurance company's motion for summary judgment. After a bench trial on this and other factual issues, the court found that the officer understood the purported scope of the new terms of the renewal policy at issue—i.e., the Regulatory and Insured v. Insured Exclusions at issue. *American Casualty No. 3.* However, the court noted that this factual finding did not end the inquiry:

> Since Jack Christensen understood the new terms of the policy to exclude from coverage suits by the FDIC, it must be determined whether Jack's knowledge imputes to the other insureds. Jack's knowledge imputes under an agency theory if he had actual and/or apparent authority from the other officers and directors to procure officers' and directors' liability insurance for the insureds or, absent any authority, whether the insureds ratified his actions.

*American Casualty No. 3.* Based on the record developed at trial, the court then proceeded to answer each of these questions in the negative.

First, the court discussed whether Christensen had actual authority from the other officers and directors to procure D & O liability insurance for the insureds. The court noted that Christensen and all other officers and directors testified that he did not have the authority to make major decisions concerning insurance matters such as the purchase of new policies or policies with substantially different terms. The court then concluded that it was satisfied

that Christensen had authority only to accept a renewal of D & O insurance coverage in place, and had no express authority to procure new insurance or to agree to significant material changes in D & O coverage, such as the Regulatory and Insured v. Insured Exclusions.

The court went on to examine whether or not Christensen had apparent authority to procure a new insurance policy or to agree to significant changes in the bank's existing D & O coverage. It noted that question number one appearing on the policy application was concrete evidence favoring plaintiff's position that Christensen had apparent authority to procure the policy with the exclusions at issue. That question designated Christensen as an agent of the bank and of all insured directors and officers to receive any and all notices from the insurer concerning this insurance. While observing that this designation supported the insurance company's position that Christensen had apparent authority, the court found that this designation was not dispositive on this issue in light of several factors, including evidence that the insurance company was not acting in complete good faith in regard to the 1984 policy application. Thus, the court held that the notice to Christensen was inadequate and that the plaintiff "should have directed a formal written notice of non-renewal to the bank or notified the insureds individually that the coverage provided in the policy would be terminated and more limited coverage would be substituted therefor."

Applying the analysis of *American Casualty*, FDIC argues that although Osendorf was an agent of the Bank, he had neither actual nor apparent authority to accept notices or to procure a policy that contained Regulatory or Insured v. Insured Exclusions. In addition, the FDIC contends that these exclusions could not apply to the Third–Party Defendants because there is no evidence of an agency relationship between the Third–Party Defendants and Osendorf; it claims that Bernadine and Douglas Winter never gave Osendorf any authority to act on their behalf as "Insureds" under the policy. The FDIC would further argue that because Osendorf was

an agent of St. Paul as well as an agent of the Bank at the time notice of coverage changes was received, and because St. Paul sent the notice of coverage changes to Osendorf's insurance agency and did not send the notice of change to the Bank, the notice was deficient and the Regulatory and Insured v. Insured Exclusions should not be imputed to the Bank or the Third–Party Defendants.

The facts in the present case differ substantially from those in *American Casualty*. Robert Osendorf, as Executive Vice President of the State Bank of Greenwald, the Bank's second most highly paid officer, one of the three members of the Bank's Board of Directors, and as the officer and director in charge of direction of the Bank's insurance needs, was clearly an agent of the Bank for the purposes of procuring D & O insurance coverage and accepting notice as to changes in this coverage. Similarly, deposition testimony by Bernadine and Douglas Winter clearly demonstrates that they intended that Osendorf act on their behalf and subject to their control for D & O insurance policy coverage. Thus, the court finds that as a matter of law Osendorf was Bernadine and Douglas Winter's agent for the purposes of obtaining D & O insurance.

Given the existence of an agency relationship, the court also finds that under this relationship, there is no genuine issue of material fact as to Osendorf's authority to accept notice and to agree to significant changes in the Bank and the Third–Party Defendants' existing D & O coverage, such as the inclusion of Regulatory and Insured v. Insured Endorsements.[2] Here, unlike in *American Casualty*, where all the officers testified that the insurance duties were solely of a ministerial nature, Bernadine Winter testified in her deposition that while an officer of the Bank, the only thing Osendorf worked on was insurance and that he had complete control of insurance matters. In addition, she stated that Osendorf was fully in charge of insurance matters and

never discussed the renewal policy with the Board; that "he just went ahead with the insurance." Similarly, Douglas Winter testified that Osendorf was generally responsible for the insurance policies of the Bank. When asked about discussions related to insurance, Winter testified that "I can't answer that because I don't know. The insurance coverage was handled by Bob [Osendorf]. What he did is what we accepted." Douglas Winter also stated in relation to the insurance policies that "Like I mentioned before, I didn't have a dang thing to do with them." Other testimony in both Bernadine Winter and Douglas Winter's deposition shows that Osendorf was given full responsibility for handling any insurance matters that arose at the Bank, and that Bernadine and Douglas Winter relied on Osendorf's expertise as to insurance matters.

The facts of *American Casualty* stand in sharp contrast to those in the present case. The Bank and Bernadine and Douglas Winter gave Osendorf direct authority to decide all insurance matters related to the D & O policies. In addition, not only are there direct statements by Douglas and Bernadine Winter that they relegated insurance responsibilities entirely to Osendorf, but the FDIC has proffered no evidence to the contrary. In light of this fact, the court finds no genuine issue of material fact exists as to Osendorf's authority and finds as a matter of law that Osendorf had the actual authority to both procure the renewal insurance and to agree to significant changes in the Bank's existing D & O coverage, including St. Paul's inclusion of the Regulatory and Insured v. Insured Exclusions.

■ The FDIC also argues, however, as a result of Osendorf's dual role as agent for St. Paul and agent for the Bank and Third–Party defendant, notice to Osendorf of the policy changes should not be imputed to the Bank and Third–Party Defendants; that Osendorf in effect received this

---

2. In addition, arguably an agency relationship between the Third–Party Defendants and Osendorf is unnecessary where, as here, the bank is the "named insured" on the declarations page of

the policy and its directors and officers are included in the policy because they are defined as insureds in the policy.

notice as an agent of St. Paul and to impute the notice to him as agent to the Bank and the Winters would be unfair. In so arguing, they cite to the *American Casualty No. 3* opinion's criticism of the "less than open and candid" manner in which the insurance company there notified its insureds of the existence and meaning of the Regulatory and Insured v. Insured exclusions.

It is not unusual for an insurance agency like the Greenwald Agency to represent both insurer and insured, and it is well-established that such a dual agency is proper where the agent acts with the consent and authority of both principals. J. Appleman, *Insurance Law and Practice,* § 8736. This general rule has long been accepted in Minnesota. *Hamm Realty Co. v. New Hampshire Fire Ins. Co.,* 80 Minn. 139, 83 N.W. 41 (Minn.1900); *Nelson v. American Reliable Ins. Co.,* 286 Minn. 21, 174 N.W.2d 126 (Minn.1970).

In the present case, St. Paul was fully aware that Osendorf was an officer and director of its insured, acted on behalf of the insured in obtaining insurance, and was an additional insured under the D & O written policy. St. Paul had no objection to this arrangement. Similarly, the Bank's officers were aware of Osendorf's representation of insurers, including St. Paul, through the agency. The Bank had no objection to this arrangement. Thus, Osendorf's dual agency in the case at hand was entirely proper.

Moreover, in contrast to *American Casualty,* the court finds no evidence that St. Paul acted in a "less than open and candid" manner in notifying its insureds of the existence and meaning of the Regulatory and Insured v. Insured exclusions. St. Paul sent the notice of the exclusions to Osendorf at the Greenwald State Agency which was located within the Bank. As noted earlier, Osendorf was one of only three members of the Bank's Board of Directors. Additionally, Osendorf handled all insurance matters for the Bank and was listed in the application for renewal insurance as being authorized to receive all notices from St. Paul concerning the D & O

insurance. Given Osendorf's close ties with the Bank, the court finds it was entirely reasonable for St. Paul to deliver notice of reduction to Osendorf as a representative of the Bank. Thus, as there is simply no evidence of any bad faith or bad intent on St. Paul's part related to delivery of the notice of reduction in coverage, and because Osendorf had actual authority to accept notice and procure substantial changes in the D & O policy on behalf of both the Bank and the Third–Party Defendants, the court will deny FDIC's summary judgment motion as to the notice issue.

### B. *Contract Construction*

The FDIC next argues that the Regulatory and Insured v. Insured Exclusions are ambiguous and should be construed strictly against St. Paul and thus do not bar coverage of the FDIC's claims in the D & O action. Under Minnesota Law, whether the language of an insurance policy is ambiguous is a question of law to be decided by the court. *Columbia Heights Motors v. Allstate Ins. Co.,* 275 N.W.2d 32, 34 (Minn.1979); *Otten v. Stonewall Ins. Co.,* 511 F.2d 143, 147 (8th Cir.1975). Minnesota courts follow the general rule that an insurance policy will be construed liberally in favor of the insured and strictly against an insurer. *AWG Farms, Inc. v. Federal Crop Ins. Corp.,* 757 F.2d 720, 726 (8th Cir.1985) (applying Minnesota law).

The Minnesota Supreme Court has held that an insurer has the burden of proving a policy exclusion applies. *Henning Nelson Construction Co. v. Fireman's Fund American Life Ins. Co.,* 383 N.W.2d 645, 652 (Minn.1986). The Minnesota Supreme Court has also said that "[e]xclusions in insurance contracts are read narrowly against the insurer." *Atwater Creamery Co. v. Western Nat'l Mutual Ins. Co.,* 366 N.W.2d 271, 276 (Minn. 1985). Any ambiguity in an insurance contract must be construed in favor of the insured. *Hubred v. Control Data Corp.,* 442 N.W.2d 308, 310 (Minn.1989). Where clauses are irreconcilably inconsistent or susceptible of two meanings the policy will be construed against the insurer. *Rustho-*

*ven v. Commercial Standard Ins. Co.,* 387 N.W.2d 642, 644–45 (Minn.1986). The reviewing court may not, however, read ambiguity into the plain language of an insurance contract. *Henning Nelson,* 383 N.W.2d at 652. "The policy must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning." *Id.* at 652.

### 1. Insured v. Insured Endorsement

■ The St. Paul argues that the Insured v. Insured Exclusion unambiguously bars coverage suits by a regulatory authority when they assert claims belonging to the institution. This endorsement to the policy reads as follows:

> ... it is agreed that the Company shall not be liable to make any payment for loss in connection with any claim or claims made against the Insured(s) by any other Insured(s) as defined in the Policy, except for shareholder's derivative actions....

The FDIC, on the other hand, claims that it is not clear from the language of the policy whether a receiver or purchaser of the bank is an "insured" within the meaning of the policy. As such, the FDIC contends an ambiguity exists in the policy which must be resolved adverse to plaintiff. Reviewing the language of the 1986 policy and the endorsements thereto, the court finds that it is not apparent from the face of the Insured v. Insured Exclusion that it was intended to exclude claims brought by the FDIC. The policy definition of Insured includes "a corporation(s) named in item 1 of the declaration, and includes subsidiaries ..." Item 1 of the declaration lists the State Bank of Greenwald. Thus, while it is clear that under the policy the State Bank of Greenwald is an Insured, it is by no means clear that Insured includes the FDIC which took the bank over as a receiver. This interpretation of the policy is further supported by the fact that St. Paul specifically included an endorsement that precluded suits by the FDIC. This demonstrates that St. Paul knew what language to use to explicitly preclude such suits. In addition, neither the Insured v. Insured Exclusion nor the

definition of "Insured" specifically includes language indicating that such terms and the prescription of coverage contained therein is to apply to assignees of the insured.

These factors indicate that there is ambiguity as to whether the Insured v. Insured Exclusion was intended to cover claims by the FDIC. In addition, a number of courts that have squarely addressed this question, have concluded that an endorsement such as the Insured v. Insured Exclusion is ambiguous as to whether claims by the FDIC are precluded. *See American Casualty Number 3,* 1990 WL 66505 (N.D.Iowa Feb. 26, 1990); *Continental Casualty Co. v. Allen,* 710 F.Supp. 1088, 1098 (N.D.Tex. 1989); *American Casualty Co. v. FSLIC,* 704 F.Supp. 898, 901 (E.D.Ark.1989) (where the court found that construing the policy as a whole, the "company's" that "the Insured v. Insured Endorsement purports to exclude is susceptible to more than one reasonable interpretation."); *Federal Deposit Ins. Corp. v. National Union Fire Ins. Co.,* No. 3–85–1089, slip op. at 9–10, 1989 WL 251473 (E.D.Tenn. Jan. 6, 1989).

Thus, as the court finds that the Insured v. Insured Exclusion is susceptible to more than one reasonable interpretation, the policy will be construed against the insurer. The court therefore construes the Insured v. Insured Endorsement strictly against the insurance company and finds the exclusion does not apply to preclude coverage for suits by the FDIC.

### 2. The Regulatory Exclusion

■ The FDIC also claims that the Regulatory Exclusion contained in the policy is susceptible of more than one reasonable interpretation and therefore should be construed strictly against St. Paul.

The regulatory exclusion in question provides as follows:

> ... there is no coverage for any claims made against the Directors or Officers of the Insured based upon or attributable to any claim, action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation ...

The FDIC claims that this endorsement is subject to two other reasonable interpretations. First, the FDIC claims that it could be construed to preclude coverage for direct suits by the FDIC against directors and officers for statutory and regulatory violations. Secondly, the FDIC claims that this endorsement could also be read to exclude coverage only for situations where the FDIC is a former bank customer who then sues a director or officer of the failed bank; that this endorsement precludes only secondary suits that arise as a result of actions brought by the FDIC as third parties, and *not* direct actions by the FDIC.

While it is true under Minnesota Law that if an endorsement is subject to two reasonable interpretations, it should be read in favor of the insured, it is also true that a reviewing court may not, read an ambiguity into the plain language of an insurance contract. *Hubred v. Control Data,* 442 N.W.2d at 310. St. Paul's intent to preclude all suits brought by the FDIC could not be stated in more explicit language in the present endorsement. The court will not read into the plain language of the endorsement the limitations proposed by the FDIC. This court follows the rationale of numerous other courts who have concluded that similar regulatory endorsements in D & O policies are unambiguous. *American Casualty Co. of Reading, Penn. v. Baker,* 758 F.Supp. 1340 (C.D.Cal.1991); *American Casualty Number 3,* 1990 WL 66505 (N.D.Iowa 1990); *American Casualty Co. of Reading, Penn. v. FSLIC,* 683 F.Supp. 1183, 1186 (S.D.Ohio 1988). Consequently, the court finds that the language of the regulatory endorsement precludes coverage for the D & O suit brought by the FDIC.

### C. *Public Policy Considerations*

█ Given this court's decision that the regulatory exclusion precludes coverage of the FDIC's claims in the D & O action, FDIC argues that the court should refuse to enforce the regulatory exclusion on public policy grounds. It claims, that the regulatory exclusion as interpreted, will seriously hamper the FDIC's ability to discharge its statutory duties and obligations with respect to the liquidation of the bank and therefore should be declared as void and contrary to public policy. *See* Minn.Stat. § 49.24, subd. 2; 12 U.S.C. § 1821(d)(2)(B)(iv).

It is well settled, that for contractual provisions to be void for public policy reasons, they must be injurious to the public good or be subversive to sound morality. *Ritter v. Mutual Life Ins. Co.,* 169 U.S. 139, 154, 18 S.Ct. 300, 305, 42 L.Ed. 693 (1898). Thus the most often found violators of public policy are contracts to induce criminal conduct or contrary to statutory law. *Northwestern Mutual Life Ins. Co. v. McCue,* 223 U.S. 234, 32 S.Ct. 220, 56 L.Ed. 57 (1911); *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902). *See, also, Continental Casualty Co. v. Allen,* 710 F.Supp. 1088, 1099.

The Sixth Circuit in the recent case of *FDIC v. Aetna Casualty & Surety Co.,* 903 F.2d 1073, 1077 (6th Cir.1990), addressed a similar public policy argument. In *Aetna,* the underlying suit was premised on Aetna's refusal to allow FDIC, as receiver for United Southern Bank of Nashville, to claim coverage under certain banker's bonds. The bonds provided coverage for losses caused by dishonest acts of employees. The bonds contained a clause that stated that they would be duly terminated immediately upon the taking over of the insured by a receiver or other liquidator or by state or federal officials. The FDIC attempted to recover on the bonds, but Aetna refused to pay.

The Sixth Circuit rejected FDIC's argument that enforcing the clause violated public policy. The court stated the standards for determining whether the exclusion violated public policy by quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1944):

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general consideration of supposed public interest.... As the term 'public policy' is vague, there must

be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy.... It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated. Only dominant public policy would justify such action.

*FDIC v. Aetna,* 903 F.2d at 1077 (cites omitted).

The *Aetna* court noted that 12 U.S.C. § 1821(e)(12)(A) states "that the receiver may enforce any contract, other than a directors or officers liability insurance contract or depository interest bond, notwithstanding any provision of the contract providing for termination ... of rights upon ... insolvency or the appointment of a conservator or receiver." *Aetna,* 903 F.2d at 1078. The court held that this statute did not provide the basis for a "dominant public policy" that would justify voiding the exclusion. *Id.* The court concluded by stating that "the dominant public policy exposed by this review is that the party's freedom of contract must not be disturbed. *Id.*

Similarly, in the case at hand, there is no evidence that enforcement of the Regulatory Endorsement will in any way contravene statutory law. There is no statute that expressly invalidates the regulatory exclusions in directors and officers' liability policies. In addition, directors and officers' liability insurance is optional under all the rules and regulations promulgated by the various regulatory agencies that oversee the Bank.

The FDIC also argues that to hold the endorsements enforceable gives the parties the rights to bargain away FDIC's statutory right to marshal and collect assets. However, this court agrees with the court in *Continental Casualty,* 710 F.Supp. 1088, 1089, that this argument overlooks the very important fact that in order to marshal and collect an asset, the failed bank must have it as an asset. Here, the bank did not own as an asset director's and officer's liability insurance without an FDIC endorsement. Therefore, such argument fails. Nothing in the endorse-

ment affects FDIC as receiver to have all the rights and claims that the failed banking institution would have had.

*Id.* at 1099–1100.

Thus, as the court finds no "dominant public policy" that would justify invalidating the exclusion contained in the insurance policy, the court will deny the FDIC's motion for summary judgment on public policy grounds.

## D. *Reasonable Expectations Doctrine*

The FDIC and the Third–Party Defendants next contend that the regulatory exclusion is not effective because it violates the Third–Party Defendants' and Bank's reasonable expectation of coverage by eviscerating a previously-agreed to term.

In *Atwater Creamery Co. v. Western National Mutual Insurance Co.,* 366 N.W.2d 271 (Minn.1985), the Supreme Court adopted the reasonable expectations doctrine. The reasonable expectations doctrine "asks whether the insured's expectation of coverage is reasonable given all the facts and circumstances." *Hubred v. Control Data Corp.,* 442 N.W.2d 308, 311 (Minn.1989). This doctrine "enforces the reasonable expectations of the insured when a hidden exclusion exists in the policy." *Park v. Government Employees Ins. Co.,* 396 N.W.2d 900, 902 (Minn.Ct.App. 1986). In *Atwater,* the Supreme Court of Minnesota applied this doctrine to interpret insurance contract language applicable under a burglary loss claim to find coverage consistent with the reasonable expectations of the insured, even though the policy provisions did not cover those expectations. *Id.* at 277. In so doing, the Supreme Court found no ambiguity in the policy, but found hidden major exclusions and unconscionability of the clause due to unequal bargaining power and insured's lack of insurance expertise. *Id.*

Relying on *Atwater,* the FDIC and the Third–Party Defendants contend that the officers and directors of the bank had a reasonable expectation that their D & O policy would cover them in the event of any claims made against them by a regulatory agency and that therefore this court should

enforce the reasonable expectations of the parties.

The court finds, however, that Minnesota law clearly precludes application of the reasonable expectations doctrine under the facts of the present case. Minnesota courts have consistently restricted application of the doctrine to exceptional cases where a policy provision is both a "hidden major exclusion" and unconscionable as a result of unequal bargaining power where the insured may have been misled. *See, e.g., Marschall v. Reinsurance Ass'n of Minnesota,* 447 N.W.2d 460, 462 (Minn.Ct. App.1989); *National City Bank of Mpls. v. St. Paul Fire and Marine Ins. Co.,* 435 N.W.2d 57 (Minn.Ct.App.1987), *rev'd on other grounds,* 447 N.W.2d 171 (Minn. 1989); *Morris v. Weiss,* 414 N.W.2d 485 (Minn.Ct.App.1987). Furthermore, the Minnesota Court of Appeals in *Empire State Bank v. St. Paul Fire and Marine Fire Ins. Co.,* 441 N.W.2d 811 (Minn.Ct. App.1989), rejected the doctrine completely with respect to the bank, since the doctrine of reasonable expectations is related to the doctrine of contracts of adhesion and:

> Here, there is no disparity between the bank and the insurance company that would lead us to apply the reasonable expectations doctrine. The fact that Empire is a small country bank does not relieve it of the responsibility of reading and understanding the terms of the bond, which are plain and unambiguous.

*Id.* at 814.

In the present case, as in *Empire,* the exclusion in question was not hidden in the policy; the terms of the regulatory exclusion were clearly set forth in the 1986 policy and were referred to directly on the declarations page of the policy. In addition, the Bank and Third–Party Defendants' agent, Osendorf, was a licensed insurance agent, and cannot be said to have had unequal bargaining power as against the insurance company. The court finds that inclusion of the Regulatory Endorsement in the 1986 policy did not violate the reasonable expectations of the Bank and the Third–Party Defendants as to the scope of coverage afforded by the 1986 policy.

Therefore, the court will deny the FDIC's motion for summary judgment on this point as well and will grant the St. Paul's motion for summary judgment to the effect that the D & O suit by the FDIC is not covered under the policy in question.

Accordingly, upon all the files, records, and proceedings herein,

IT IS HEREBY ORDERED That:

1. The FDIC's motion for summary judgment is DENIED;

2. The St. Paul's motion for summary judgment is GRANTED;

3. The Clerk of Court shall enter judgment as follows:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED That the regulatory exclusion contained in the 1986 policy number 400 HG 6741 excludes coverage to the insured for the claim asserted against the former officers and directors of the State Bank of Greenwald by the Federal Deposit Insurance Corporation.